UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KEN JOHANSEN, individually          )
and on behalf of all others         )
similarly situated,                 )
                                    )
        Plaintiffs,                 )
                                    )Civil Action
v.                                  )No. 15-12920-ADB
                                    )
LIBERTY MUTUAL GROUP, INC.,         )
and Spanish Quotes, INC.,           )
d/b/a WESPEAKINSURANCE,             )
et al,                              )
                                    )
        Defendants.                 )
                                    )

BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE

## **MOTION HEARING**

John J. Moakley United States Courthouse
Courtroom No. 17
One Courthouse Way
Boston, Massachusetts  02210
Friday, May 27, 2016
9:33 a.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 7209
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2         BRODERICK LAW, P.C.
            By: Edward A. Broderick, Esq.
 3         99 High Street
            Suite 304
 4         Boston, Massachusetts  02110
            On Behalf of the Plaintiffs
 5
            ROBINS KAPLAN LLP
 6         By: Michael Reif, Esq.
            800 LaSalle Avenue
 7         Suite 2800
            Minneapolis, Minnesota  55402-2015
 8         - and -
            By: Manleen K. Singh, Esq.
 9         800 Boylston Street
            Suite 2500
10         Boston, Massachusetts  02199
            On Behalf of the Defendant Liberty Mutual Group Inc.
11
            STEPTOE & JOHNSON LLP
12         By: Michael Dockterman, Esq.
            115 South LaSalle Street
13         Suite 3100
            Chicago, Illinois  60603
14         On Behalf of the Defendant Digitas, Inc.

15         HERMES NETBURN
            By: Michael S. Batson, Esq.
16         265 Franklin Street, 7th Floor
            Boston, Massachusetts  02110-3113
17         On Behalf of the Defendant Precise Leads, Inc.

18         KOLTUN LAW OFFICE
            By: Joseph J. Koltum, Esq.
19         400 Trade Center
            Suite 5900
20         Woburn, Massachusetts  01801
            On Behalf of the Defendant David Stafford
21

22

23

24

25
```

P R O C E E D I N G S

1

2       THE CLERK:  All rise.

3       (The Court enters the courtroom at 9:33 a.m.)

4       THE COURT:  Good morning, everyone.

5       THE CLERK:  Court is in session.  You may be seated.

6       Now hearing civil matter 15-12920, *Johansen v. Liberty*

7    *Mutual Group, Inc.*  Will counsel please identify themselves for

8    the record.

9       MR. BRODERICK:  Good morning, your Honor.  Edward

10   Broderick for the plaintiff.

11      MR. REIF:  Good morning, your Honor.  Michael Reif for

12   defendant Liberty Mutual.  Along with me --

13      MS. SINGH:  Manleen Singh.

14      MR. DOCKTERMAN:  Good morning, your Honor.  Michael

15   Dockterman on behalf of Digitas.

16      MR. BATSON:  Good morning, your Honor.  Michael --

17      THE COURT:  Hold on a second.

18      (Pause.)

19      THE COURT:  Okay.  Thank you.

20      MR. BATSON:  Good morning, your Honor.  Michael Batson

21   on behalf of Precise Leads.

22      MR. KOLTUN:  Good morning, your Honor.  Joseph Koltun

23   on behalf of Dave Stafford.

24      THE COURT:  Oh, Mr. Koltun.  Thank you for joining us.

25   And I understand Mr. Stafford's on the phone?

1    MR. KOLTUN:  I believe that he is, your Honor.

2    MR. STAFFORD:  Good morning.

3    THE COURT:  Okay.  This is a lot of paper for a case

4  that is not going to affect world hunger; nonetheless, we'll

5  march through it.  Mr. Stafford, let's take care of you first

6  so you could be on your way because I know you're on vacation.

7  I'm sure that you and Mr. Koltun understand that you

8  just -- you are in this case and you have to participate.  You

9  have to listen to court orders, you have to show up, you have

10  to obey deadlines.

11    You understand that, Mr. Stafford?

12    MR. STAFFORD:  Yes, your Honor.

13    THE COURT:  All right.  Now, Mr. Koltun, you and

14  Mr. Stafford are going to supplement your discovery responses

15  for the plaintiff?

16    MR. KOLTUN:  Yes, your Honor, we are.  We have

17  actually already provided supplemental interrogatory responses

18  yesterday to the interrogatories that were outlined in the

19  motion to compel.  Those were just provided yesterday.  We are

20  also going to supplement the document production as soon as I

21  get a handle on what has actually been produced and responded

22  to by prior counsel.

23    I received about 175 pages of Bates-stamped documents

24  on Tuesday evening, but I'm not sure that those have even been

25  officially produced and I'm not even sure if the first request

for production of documents was responded to.  So I'm trying to

get my hands around that and we will respond to those requests.

        THE COURT:  All right.

        And, Mr. Broderick, is what they are doing acceptable

to you?

        MR. BRODERICK:  Yes, provided we get call records.

That's our biggest focus, you know, and we think that they have

access to the Invoca system, the platform on which the calls

are made.  So while they say, "We didn't make the calls,

somebody else we were working with did," we want to get

whatever they have access to, whether they made the calls

themselves or somebody did it, that they were contracting with,

as well as I think a full interrogatory response of what is

this complicated interrelationship between multiple parties and

what their roles were.  But that said, we'll wait and see what

documents are produced.

        THE COURT:  Okay.

        All right.  Mr. Stafford, are we clear that you either

need to be represented or show up yourself or otherwise respond

appropriately to court orders?

        MR. STAFFORD:  Yes, your Honor.

        THE COURT:  All right.  I'm going to take you at your

word for that.  You've been very frustrating to date.  But

since you have an attorney here and I have your representation

on that, if you want to hang up and go enjoy your vacation, you

1  may do that, or you can stay.

2       MR. STAFFORD:  No, your Honor.  That's fine.  I have

3  counsel there.

4       Just to be clear, prior counsel told me that -- after

5  they withdrew, that I was not allowed to respond to a lot of

6  that.  I didn't even understand which ones I was supposed to.

7  So now that I have counsel, I'll make sure that I do respond.

8       THE COURT:  Okay.  You know, I have a limited range of

9  solutions to these problems.  And I have another case where I

10 actually just had to order that somebody be arrested for

11 failure to comply with court orders only because once I

12 threaten you and fine you, I have nothing else but prison.  So

13 either -- if you're going to represent yourself, which I'm glad

14 you no longer are, you really have to pay attention to what the

15 filings say or you need to hire counsel to make sure you don't

16 get too far into the soup on this stuff, all right?

17      But no harm, no foul.  You have a lawyer here now and

18 we'll take it as it comes going forward.

19      MR. BRODERICK:  Your Honor, may I make one point?

20 Mr. Koltun is not yet appearing for Spanish Quotes, which might

21 continue to be an issue because they're a corporation.  He's

22 here today only on behalf of Mr. Stafford.  That's an

23 important --

24      MR. KOLTUN:  That is correct, your Honor.  I am

25 appearing today on behalf of Mr. Stafford in response to the

order to show cause.  But I have worked with Mr. Stafford to
provide the interrogatory responses on behalf of Spanish
Quotes, and I will represent to the Court that I will continue
to work with Mr. Stafford to provide responses to the request
for production of documents.

THE COURT:  Is Spanish Quotes still in business?

MR. KOLTUN:  Hanging on by a thread, your Honor, and I
do want to represent to the Court that I do represent Spanish
Quotes in a state court proceeding.  It's a collection matter.
But they're barely hanging on, your Honor.

THE COURT:  Mr. Stafford, Spanish Quotes, it's a
company that -- they need a lawyer.  A company can't show up in
court without being represented by a lawyer.  A person can
represent themselves but a corporation can't.

MR. STAFFORD:  Yes, your Honor.  That's -- I
understood that before.  And we just simply don't have the
funds to hire an attorney for this type of litigation.  I mean,
these are huge companies that -- we don't have those kinds of
funds.

THE COURT:  Well, Mr. Broderick?

MR. STAFFORD:  And we've provided financial
information to plaintiffs, by the way, so they understand that
we didn't have the funds for this.

MR. BRODERICK:  We understand, I think -- they hired
rather expensive counsel in the first instance.

1          THE COURT:  All counsel's expensive.

2          MR. BRODERICK:  All counsel is, but this was maybe

3     more than some.  But what we really want is the data, and we

4     don't think that will be tremendously difficult to produce.

5     And given that Mr. Koltun is representing him, and individually

6     if he could just be, you know, formally retained even on that

7     limited basis, it would allow us to possibly even let them go.

8     That was part of the discussion, but we said, "Hey, look.  We

9     understand you're out of money but we need this data," whether

10    they're in the case or even if they were a third-party subpoena

11    defendant.  We have no interest in closing anybody down.

12         THE COURT:  All right.  Mr. Koltun, can you work with

13    Mr. Stafford on this and see if, perhaps, you can get him the

14    discovery and then talk to Mr. Broderick about if there's truly

15    no money there, letting Spanish Quotes out?

16         MR. KOLTUN:  Absolutely, your Honor.

17         THE COURT:  Okay?  All right, Mr. Stafford.  I've done

18    what I can for you this morning.

19         MR. STAFFORD:  All right.  Thank you, your Honor.

20         THE COURT:  You can hang up or you can stay.  It's up

21    to you.

22         MR. STAFFORD:  I will leave.  Thank you.

23         THE COURT:  I don't blame you.

24         (Mr. Stafford departs the proceedings.)

25         THE COURT:  All right.  Digitas's motion to dismiss:

1  Interesting motion.  I'm interested in it.  I don't think we

2  should hear it today.  I don't think it's fair to put anyone on

3  the spot on a motion that I didn't notice for hearing, but I

4  would like to set another date for that hearing.

5        Jen, can you do that or do we have to wait for Karen?

6        MR. DOCKTERMAN:  We're happy to appear at the Court's

7  pleasure.

8        THE COURT:  I usually have my laptop here but I didn't

9  bring it out, and I can't get to my own schedule either.

10       MR. DOCKTERMAN:  I know that we have a hearing already

11  scheduled on the 8th of June.  I don't know if the Court would

12  like to set that also as a date for this motion.

13       THE COURT:  What's the hearing set for on the 8th of

14  June?

15       MR. DOCKTERMAN:  I think that there's a status

16  conference.

17       THE COURT:  All right.  So why don't we set that for

18  the 8th of June.

19       LAW CLERK:  We have it for one o'clock.

20       (Discussion off the record.)

21       MR. DOCKTERMAN:  If that doesn't work, obviously we'll

22  appear at the Court's pleasure.

23       THE COURT:  No.  No, it's not --  I'm starting the

24  trial on the 6th and it's a lot of out-of-town lawyers and I

25  told them I'd try it from ten to four, so I can't do it at one

1   anyway, so...

2           (Discussion off the record.)

3           THE COURT:  Any estimates on how long an argument on

4   that will take?

5           MR. DOCKTERMAN:  Your Honor, we provided a very full

6   description of things in our papers and I'm happy --

7           THE COURT:  Do you want argument on it or do you want

8   me to decide it on the papers?

9           MR. DOCKTERMAN:  I'm happy to have it decided on the

10  papers, your Honor.  But obviously, I'm not the only interested

11  party here.

12          THE COURT:  No.  Is there anyone that feels that there

13  needs to be argument to supplement the papers?

14          MR. BRODERICK:  Not necessarily, your Honor.  I think

15  the papers are pretty complete.  Obviously, if you'd like --

16          THE COURT:  I've read through the papers too.  I'm

17  happy to decide it on the papers.  I haven't made a decision on

18  it yet.  I've actually read all of your briefing papers, but I

19  had my law clerk put together a packet of the cases which I was

20  going to take with me this weekend.  So I've read the briefing

21  but not the underlying cases so --

22          MR. DOCKTERMAN:  Perhaps if the Court has questions,

23  we can appear on the 8th.  It wouldn't be a full-blown argument

24  but if you have questions, we answer them and then perhaps the

25  Court can decide.

1    THE COURT: Okay. So if we're going to stick to the

2    8th, I can't do it at one -- when I try full days, I recess for

3    lunch at twelve and bring them back at quarter of one. So you

4    could come in for a status or we could cancel -- is anything on

5    for the status besides -- there -- once we have today, there

6    would be nothing besides that motion on for the 8th?

7    MR. DOCKTERMAN: I think that's correct, your Honor.

8    THE COURT: All right. Well, why don't we -- can we

9    move it to noon on the 8th and I'll cancel it if I don't have

10   any questions after the weekend?

11   MR. DOCKTERMAN: Your Honor, whatever is the Court's

12   pleasure. If you want to do it earlier in the morning or at

13   the end of the day, whatever works for you.

14   THE COURT: I can't -- ten to four and I -- I give

15   them nine-thirty for outstanding morning motions. And so let's

16   move it to noon on the 8th, and if I don't have any questions

17   after I read the cases this weekend, we'll cancel it, okay?

18   All right. So that's the motion to dismiss.

19   MR. DOCKTERMAN: Thank you, your Honor.

20   THE COURT: Plaintiffs' motion for extension of time

21   to complete discovery. What is left to do that you want to do

22   in these extra 60 days?

23   MR. BRODERICK: Well, your Honor --

24   THE COURT: Can it be done in 30 days?

25   MR. BRODERICK: That's dependent on getting the

1    records that we're seeking, and it's also dependent on

2    third-party subpoena respondents who are notoriously reluctant

3    to give over call records in these cases.  So I think it would

4    be a challenge but we'll take what we can get, if we can do it,

5    but we don't think -- we think that the schedule that we've

6    proposed doesn't actually jam the defendants as much as they've

7    said because they've got six weeks to depose our expert before

8    their opposition to class cert is due, and we feel like we've

9    jammed in not getting the class-wide discovery that we're

10    seeking after the Court directed everybody, "Look, we want full

11    discovery here and not, you know, quasi bifurcated class

12    discovery," so that's why we asked for 60 days.  And we also

13    have to schedule depositions with a lot of parties, which can

14    be a challenge.

15          THE COURT:  All right.  I mean, I'm willing to give

16    him the 60 days.  I understand the defendants' concern about

17    having the class certification opposition due in such close

18    proximity to the close of expert discovery.  So if you all want

19    some extra time for that, I'm happy to give you that as well.

20          MR. DOCKTERMAN:  Well, your Honor, obviously our

21    position is it's all unnecessary because we've satisfied the

22    plaintiff, and so that all of this is sort of protective

23    scheduling as opposed to anything else.  And to the extent that

24    plaintiff has been satisfied, to me the remaining issue really

25    would be the Court's entry of an order disposing of the case,

1    and that would leave a dispute between Liberty Mutual and

2    Digitas.

3           On that score, discovery is something which we could

4    work through, but I do have to raise the issue for you that we

5    would -- our discovery responses to the plaintiff aren't due

6    for another several weeks anyway just because of when we were

7    served, and we would hope by the 8th you've reached a decision

8    and make that all moot.

9           THE COURT:  By the 8th?

10          MR. DOCKTERMAN:  Well, if that's the date that you

11   were theoretically going to hear the motion that we had set.

12   But whenever the Court wants.  Obviously, our client would

13   prefer not to engage in discovery in a case where we have, on

14   behalf of all of the defendants, satisfied everything that the

15   plaintiff wants.  Full damages, anything that the plaintiff

16   could claim, we took the number right out of the plaintiffs'

17   interrogatories --

18          THE COURT:  I understand.  I understand the basis.  So

19   even if I decided by the 8th, which I may have, it's going to

20   require a written decision, and there's a zero percent chance

21   that a written decision is going to be done between now and

22   Tuesday.  So why don't we -- I'll give him the 60 days and, you

23   know, don't spend too much money between now and then.  We'll

24   try and get a decision -- I don't know what the decision is

25   going to be, but we'll try and get it done as quickly as we

can.  We're just starting an eight-week trial on Monday and
we're sitting ten to four so --

       MR. DOCKTERMAN:  Well, I have tried to craft a way for
you to take this off your calendar altogether, and in talking
to Liberty, I believe if the plaintiffs' claims were over,
Liberty and Digitas would find a way not to have to trouble you
with their dispute.

       THE COURT:  I was confident of that.

       MR. DOCKTERMAN:  I'm sure that the Court has read that
correctly.  So there's not much more I can do in order to clear
it for your eight-week trial.

       THE COURT:  I honestly don't know what the resolution
to the motion is.  I think it's a very interesting issue.  I
haven't encountered it before.  The briefing is all very good
and I just -- I'm interested in it but I really haven't made a
decision.

       MR. REIF:  Your Honor, I'd just suggest that you
consider extending only 30 days.  I think that the discovery
that plaintiff is seeking has been largely submitted already.

       THE COURT:  I agree.  I think that 60 days is a long
time to extend this and I feel a little back-doored by it
because I already told you that you couldn't have the time when
I set the initial scheduling conference and now you're coming
back to the same well for it, so it's like you're asking mom
when dad said no.  But, on the other hand, there's a pending

motion to dismiss and it doesn't make sense for anybody to be
spending too much money when that isn't resolved one way or the
other.  So Liberty did join two parties in the middle of the
whole thing.  They did know about them but they weren't
officially joined to the thing.  So I don't think the 60 days
is going to make or break anybody in any significant way so --

MR. REIF:  Yes, your Honor.  Thank you.

MR. BATSON:  Your Honor, Michael Batson.  I represent
Precise Leads.  I just wanted to throw in my hat and say I
agree with Digitas's counsel and Liberty's counsel.

THE COURT:  I saw that, yeah.  I see there's been
plenty of agreement on the defendants' side, which is nice to
see.

All right.  So I'll give you the 60 days on that.  Is
there going to be expert discovery in this case?  What's going
to be the expert discovery?

MR. BRODERICK:  I would think so, your Honor.  I would
think we would have depositions of the experts.

THE COURT:  What are the experts about?

MR. BRODERICK:  The experts are about identifying
people who were on the do-not-call list, and you have to be
called more than once in a 12-month period.  So you have to
analyze the call records.  So they're sort of data experts.
And they, you know, generate a pretty detailed report saying,
This is the number of violations, these are the unique numbers

called, you know, so there's a fair bit to it.  And they have
to do the internal do-not-call analysis as well, and that means
we have to have the complete internal do-not-call list from
Liberty to identify the people whose numbers were called.

So that's the kind of work an expert does in this
case, and there's typically a fair amount of fighting over it.

THE COURT:  Okay.  I'll leave the expert discovery
deadlines in there.  If you all want more time, I can either
give you it now or if you want to make a motion when it becomes
apparent that you need it, if you need it.

MR. DOCKTERMAN:  I'd rather do an "if," your Honor, if
that's all right with you.

THE COURT:  That's fine.  I know you're -- you want to
be optimistic over that, right?

MR. DOCKTERMAN:  Confident, your Honor.

THE COURT:  Yeah.  All right.

All right.  That leaves plaintiffs -- that leaves
plaintiffs' motion to compel discovery responses from Liberty.
I think they have the better part of the argument.  I wholly
understand your frustration on this.  I don't know what the
answer is, but defending it on the merits doesn't obviate your
discovery obligations.  I don't -- I don't -- so I know that
you've agreed to produce through 2014, you want through 2011.
What's the -- how are you coming up with 2014?

MR. REIF:  Your Honor, we were restricting the amount

1   of time to the period in which plaintiff is actually alleging

2   that he received calls so we thought that we were making a

3   good-faith effort to giving him call records but not expose

4   privacy concerns related to records that went that far and,

5   frankly, trying to limit calls that we view as not violative of

6   the TCPA.  And, again, I understand some of this goes to the

7   merits, but the merits say a lot about relevancy of these

8   records, your Honor.

9          The records that Liberty has are records of inbound

10  calls made by people actually calling Liberty themselves and

11  warm transfers, so people that have requested an auto insurance

12  quote, have been called to confirm that request, they've

13  confirmed their consent to be transferred and --

14         THE COURT:  I saw what you said about -- but he says

15  that that's not right.  He says that he really wasn't a warm

16  call or an incoming call.

17         MR. REIF:  That's right.  And, your Honor, it's our

18  belief that this was an anomaly.  And we also know that -- and

19  we just deposed plaintiff yesterday -- that on every one of the

20  calls that he received, he confirmed to the caller his interest

21  in receiving an auto insurance quote and transferred to an

22  outside agent.  And so this is not a typical kind of case.

23         And I think that that's really, the inquiry that we

24  need to engage in for class certification, really has nothing

25  to do with the rest of the class, or people that the records

1   that Liberty might have that they would be producing.  The real

2   question is, this person who made it a point to keep saying yes

3   even though he wasn't interested in insurance, who never asked

4   that initial caller to be put on their do-not-call list,

5   whether he is in any way representative of the class.  Nothing

6   about the records that Liberty has is going to say anything

7   about whether, you know, a broader class should be certified.

8          THE COURT:  Well, it could be -- you asked for -- you

9   didn't ask for any bifurcated discovery so we're in all of it.

10  Now, why do you need to 2011 and not to 2014?

11         MR. BRODERICK:  Because that's the class period, your

12  Honor.

13         THE COURT:  But why is it the class period?

14         MR. BRODERICK:  It's a four-year statute of

15  limitations, so that's how far back it goes.  And we'd be

16  facing a problem where they'd say, Well, you can't ascertain

17  the class because you don't have any records to identify the

18  people over the four-year period.  I'd add that limiting the

19  information to Mr. Johansen's calls, we'd lose complaints

20  lodged by other people who'd say, Hey, didn't have my consent

21  to call me.

22         And another point I'll make about this supposed

23  consent, I said, he's given sworn testimony that he did not go

24  to any of these websites, as did his wife, but even if he had

25  visited that website, it's legally invalid consent.  You have

1 to have --

2       THE COURT: Maybe. I saw your brief. Maybe it is,

3 maybe it isn't. I mean --

4       MR. BRODERICK: We'd say -- I mean, in any event, it's

5 an affirmative defense so they're sort of giving, you know, a

6 sua sponte grant of summary judgment on an affirmative defense

7 to themselves as a reason not to give discovery and we've --

8       THE COURT: That's what good lawyers do.

9       MR. BRODERICK: I suppose. But it's not a -- we don't

10 think it's a particularly strong defense given what we've seen

11 of the supposed websites, and it's an issue we've faced in

12 other cases.

13       And as to saying "yes" on the calls, that's just an

14 investigation to try to find out who's calling him, and that's

15 after the violation has occurred. He's on the do-not-call

16 list.

17       THE COURT: I'm going to give you discovery. I just

18 want to make sure that it stays proportional to the case so if

19 there's some meaningful way to split it up, I would do that.

20 How -- what's the volume of data that we're talking about?

21       MR. REIF: I think the call records that Liberty has,

22 they're somewhere in the neighborhood of 300,000.

23       THE COURT: Can you segregate -- can you segregate

24 incoming from the outgoing?

25       MR. REIF: No. And again, part of that, your Honor,

1　is Liberty is not placing these calls.  These are calls that

2　have made it to Liberty because people have expressed an

3　interest, either inbound or through the warm transfer or a

4　confirmation of their interest.  So that's part of the issue

5　for us.

6　　　　The other issue I'd raise, your Honor, is that Liberty

7　doesn't have calls going back to 2011 as it is.  The contracts

8　it has with the vendors at issue go back to 2012 and 2013, so

9　that would obviously impact how much we would have to put out

10　there as well.

11　　　　MR. BRODERICK:  Well, obviously they can only produce

12　what they have but, you know, from past experience we think

13　that the -- particularly the warm transfers can be identified

14　as -- you know, from the system, because people get paid for

15　these warm transfers so they have to know who's sending it in.

16　It's a pretty complicated program that tracks all the data.

17　And that's how they get $35 for a call that lasts more than

18　three minutes but if it's a transfer that occurred from a call

19　less than three minutes, they don't get anything.

20　　　　THE COURT:  Why do you want the warm transfers?

21　　　　MR. BRODERICK:  Because those are people that we know

22　received a call -- received an outbound call.  There's a claim

23　that, you know, this is people calling us, whereas a warm

24　transfer, somebody has placed a call to them, gets them on the

25　phone and transfers them over.  At least that's the way it's --

1    THE COURT:  Can you segregate the warm transfers from

2    the other calls?

3    MR. REIF:  No, your Honor.  That's what we're talking

4    about.  And really, the point is that the inbound calls

5    shouldn't be in there at all.  Their interest is in the warm

6    transfer calls and that's -- again, our understanding, based on

7    having spoken to our client about this pretty extensively, is

8    there's not a way to track which ones are inbound and which

9    ones are warm transfers.

10    THE COURT:  So what are you going to do with this data

11    once you get it?

12    MR. BRODERICK:  Our expert will analyze it for -- I

13    mean, first of all, I don't want to concede that I'm only

14    interested in warm transfers or concede that these are actually

15    inbound calls because the defense as to Mr. Johansen is "This

16    is an inbound call.  We don't make outbound calls."  Spanish

17    Quotes said, "We don't make outbound calls," and yet he's

18    clearly receiving calls so we don't concede that.

19    THE COURT:  He's right that there's a privacy interest

20    to the extent that people are making inbound calls to Liberty

21    and if they're -- you don't have any need for the inbound

22    calls.  So what are you going to do -- you have this whole

23    -- you're going to get a list of 300,000 calls.  What are you

24    going to do with them?

25    MR. BRODERICK:  We're going to analyze them to see

1  which of those people were on the do-not-call list but --

2          THE COURT:  And then what are you going to do?

3          MR. BRODERICK:  And then our expert will generate a

4  report saying how many violations of the TCPA have occurred,

5  and then they have an affirmative defense as to consent.

6          THE COURT:  How are you going to -- how are you going

7  to -- are you -- are you going to contact these people to find

8  out whether they made an inbound call?

9          MR. BRODERICK:  No.  No, that's not necessary.  It's

10  something you get from the data.  I mean, if we --

11          THE COURT:  How are you going to figure out the

12  inbound calls?

13          MR. BRODERICK:  It's hard to say.  Not seeing the data

14  and not having responses as to whether these are, in fact,

15  inbound calls or not, you know, that's something we face where

16  people say, "Well, it's not an inbound call" -- in robo call

17  cases, somebody presses one, and we've had telemarketing people

18  say, "Well, that's an incoming call.  We made a robo call but

19  then they pressed one and then it came into us."  And we

20  don't -- at this point we don't know so I can't say, "Oh, let's

21  limit it to this piece of the data."

22          MR. REIF:  Your Honor, if I may, they have seen the

23  data.  We've produced three and a half months of data.  They've

24  had ample opportunity to put that in front of their experts and

25  have them take a shot at it, and our producing more at this

point doesn't give them any more than additional numbers for them to potentially call themselves. I mean, that's why we tried to find a middle ground and produce data to them. We didn't want to be obstructionists, we tried to play along, but we wanted to be sensitive to both the factual reality of this case and also the privacy interest of the people there.

I mean, I'll just say, you know, for the people that were calling in -- and really, the whole focus of both of these programs was not for Liberty to be receiving calls that were started as a cold call. Liberty has no interest in a scattershot approach for people who may or may not be interested in insurance; they're far more interested in people that have already expressed an interest in receiving a quote than having that go to Liberty among a series of other insurers.

THE COURT: All right. I'm -- you need to produce what he's looking for, but I don't want you to call these people.

MR. BRODERICK: No, your Honor. That's not a problem.

THE COURT: All right?

MR. REIF: For which period, your Honor?

THE COURT: The class period.

MR. REIF: Okay.

THE COURT: I mean -- look, I don't think that I have -- I mean, I think they're entitled to the discovery for

the class period.  I completely understand your position, and
if you're telling me it was, you know, 300 million calls, I
could do something like proportionality, but 300,000 calls,
it's -- and the data that he's looking for -- I'm concerned
about the privacy of people that are calling you, but he's not
going to reach back out to call them, so I think it needs to be
produced.

MR. REIF:  Okay.  Thank you, your Honor.

MR. BATSON:  Your Honor, I don't have an immediate
interest in the motion that's at issue because I don't
represent Liberty Mutual; however, we do have pending discovery
requests for Precise Leads that we're in the process of
responding to, and we were planning on hopefully responding
next week.  This issue, I think, is going to come up again with
Precise Leads.  Now, Precise Leads only just got brought into
the case, and this is the first time I'm actually hearing that
discovery is on a class-wide basis and not a pre-certification
discovery, which is what makes more sense here in my mind.  We
have --

THE COURT:  Liberty -- at the initial scheduling
conference there was no request for bifurcated discovery.

MR. BATSON:  Understood, your Honor.  I'm just saying
this is the first I've heard it and that's not how we've been
putting together our discovery request.  Precise Leads is a
lead aggregator, never made a phone call to a single person,

1   dealt with collecting the information that was input on the

2   web.

3        I think the discussion that plaintiffs' counsel just

4   had illustrates why it might be premature to get into this type

5   of discovery, and the reason for that is in Mr. Johansen's case

6   we have ample evidence that he did, in fact, request to receive

7   these calls not during the calls themselves, before the calls

8   were made, and consent to them in writing and verbally, and yet

9   Mr. Johansen himself disputes it.  And you can imagine --

10       THE COURT:  Hold on a second.  So if he's not making

11  any calls, he's just aggregating, why do you need his data?

12       MR. BRODERICK:  Well, the question is:  What data does

13  he have about the calls that were made?  I don't know what he

14  has, you know --

15       THE COURT:  What do you have?  What data do you have

16  about the calls that were made?

17       MR. BATSON:  The types of data that we have, your

18  Honor, is that when somebody fills out a web form, the

19  information is input into a system.  That system

20  then -- there's a process by which the lead is purchased.  That

21  lead then gets transferred to a call center who then does what

22  it does with respect to the call.

23       Precise Leads itself does not make the phone call.

24  They don't make outbound calls.  They've never made an outbound

25  call on behalf of Liberty Mutual.  All they do is collect the

1  consent that comes in from -- and they only pass it on if that

2  consent has been given.

3      But without deciding whether that's right or wrong,

4  your Honor, the issue is, is that in every single instance

5  where a lead has generated one of these warm transfers, at

6  least from Precise Leads' stance, if plaintiff identifies that

7  someone is on the do-not-call list, the affirmative defense is

8  going to be made by, presumably, Liberty Mutual that consent

9  was provided, then we have to get into discovery of taking

10  depositions and finding out because, presumably, if they're

11  being alleged to be a member of the class, they're going to be

12  saying, "Well, no, I didn't," just like Mr. Johansen does.

13      So you end up having to take these depositions,

14  getting into their computer records.  I mean, there's all sorts

15  of discovery that may be associated with that.  And before you

16  even know that there is a class, you're now doing -- I mean, it

17  may be ten people, it may be 100 people, it may be 1,000

18  people, but however many people that is, you end up having to

19  do the individualized discovery with respect to each of those

20  people.

21      And that's why in this particular case and under these

22  circumstances had I been in the case back when you had the

23  status conference in December, I would have suggested to the

24  Court that this is a prime example of a case where you have to

25  do some preliminary class certification discovery before you

1   really get into the merits, because with Precise Leads -- and I

2   just had this conversation yesterday with my client.  Precise

3   Leads, if they want to actually provide all the data that they

4   have with respect to their leads, and so much of it is

5   irrelevant because it doesn't relate at all to the allegations

6   here, but if you want to data mine into it and provide all the

7   data, most of it -- because you're talking about computer data,

8   most of it has been archived because the expense of keeping it

9   on an active system is immense.  And so that data is all

10  archived, and that then becomes hugely burdensome to actually

11  take the time to go find it and the expense that you have to do

12  to data mine into finding that data.

13          And right now I have asked my clients to find out what

14  is the cost and what is the burden to do it.  He told me

15  yesterday, "This has now become my full-time job just

16  responding to these discovery requests," and he has a business

17  to run.

18          Nevertheless, when we respond, our intent, unless your

19  Honor tells me today not to -- our intent was to respond to

20  whatever is relevant to Mr. Johansen's claim and to what is

21  relevant in our minds to the pre-certification stage.  As I

22  said, we didn't make calls, so there's a lot of this TCPA

23  discovery that might not be relevant to a party like Precise

24  Leads, particularly --

25          THE COURT:  Okay.  I'd like to limit -- he makes some

1  good points.  I would like to limit his discovery for the time

2  being.  So how are we going to do that?

3      MR. BRODERICK:  Well, your Honor, the problem is we're

4  on this pretty fast track, and with limited time left, and if

5  the defendants were stipulating -- consent is not a bar to

6  class certification, and we're going to have a -- you know,

7  we're going to decide it on a class-wide basis later, that

8  might be fine, but I doubt that's going to the happen.

9      THE COURT:  He's --

10     MR. BRODERICK:  I mean, it's not an insignificant

11  source of information.  They're the consent provider.

12     THE COURT:  It's a central defense.

13     MR. BRODERICK:  Well, right, but it's a central

14  defense to the case that we had consent, and we think we need

15  to get that information to challenge that central defense.  And

16  not just with respect to Mr. Johansen, but getting the

17  information might undermine the validity of this purported

18  consent that -- you know, Mr. Johansen's IP address did not

19  match the supposed form so --

20     THE COURT:  No, I understand.  I read --

21     MR. BRODERICK:  Yeah, but that's a big issue.  So if

22  this is all -- you know, we have seen this in other cases.  I

23  can't speak to Precise Leads, but where a telemarketer is

24  challenged, Hey, you made a call to this person, they've

25  complained to us by the principal, the principal says, What's

the story?  They gin up a consent form with an IP address that doesn't match.

THE COURT:  Are you eventually going to have -- are you going to know the name of everybody that's in this class?

MR. BRODERICK:  Eventually, yes, whether the data is available with -- sometimes you get data -- you know, you get a lead list with a full address, as they say, We used this data, you know, this lead list to call people, that's great.

THE COURT:  Doesn't it make sense once you have a class to run it against his data?

MR. BRODERICK:  As I said, only if consent is not a barrier to the case being certified and only if they don't make a challenge that the class isn't ascertainable, and then I don't see what the bar is to class certification.

THE COURT:  I mean, your client may not be representative or typical.

MR. BATSON:  And, your Honor, I would say consent actually is a barrier to certification but not for the reason that he's hinting at; it's because it would devolve into a bunch of mini trials to try and figure out whether the person did or did not give consent.  That is going to be, probably, on all of these because, again, what Liberty Mutual did was hire people to -- at least in Precise Leads' case, to do these warm transfers which, by their very nature, are transfers where there is consent.

1    Understanding he might dispute that, but the idea that

2    consent is an affirmative defense, you're going to have to

3    figure that out in every case.  I know it's premature to be

4    talking about this, but as we think about it, before we even

5    know that there is a class, they're asking us to essentially

6    data mine a ton of information and that's just -- it's not

7    something that at this stage you need, and certainly with

8    respect to whether or not they can ascertain who --

9    You know, whether or not they have the Rule 23

10   elements that they need, they don't need our data to do that.

11   We're happy to provide it with respect to Mr. Johansen.  We're

12   not trying to suggest that we're not.  And we're trying to put

13   that together right now.  Again, even with Mr. Johansen it's

14   not an easy process, and that's one person.  Nevertheless, he

15   doesn't need that information to make his class certification

16   argument.

17   MR. BRODERICK:  Yes, we do.

18   THE COURT:  Well, he's going to make a motion for

19   class certification, they're going to say -- you're going to

20   say it's not a good class because some of these people

21   consented.

22   MR. REIF:  Your Honor, we're going to say it's not a

23   good class because by the nature of the records that we have,

24   the records that they're pulling their class from, we believe

25   everyone consented.

1       MR. BRODERICK:  We don't -- sorry.

2       MR. REIF:  No, it's not a matter of -- you know, he

3  talked about ginning up a consent sheet?  The fact is that

4  we've got call recordings showing that when people were

5  asking -- talking with Mr. Johansen, there was -- they had

6  information about him that was true.  Now, some of it was

7  outdated, that's true, some of it was an old address, but this

8  in not something that they had somehow invented.  And so I

9  don't know where that lead sheet came from.  This is the first

10  time ever hearing in their motion -- their reply that the IP

11  addresses didn't match.  We asked for that information and we

12  hadn't gotten it before.  So I'm not quite sure what that's

13  about, but that's why this goes beyond just, you know, sort of

14  the academic running of these records against some kind of

15  list.  You know, we have major concerns about, you know,

16  propriety of looking into these calls at all.

17       And just briefly, your Honor, I said earlier it was

18  300,000 calls.  I may be wrong about that number, so I would

19  ask if the Court does, in fact, ask for broader discovery, that

20  you give us a chance to get back in contact with the Court if

21  the number is much, much bigger, in which case I would be

22  asking for something more proportional.

23       THE COURT:  No, you could do that but, you know,

24  they're entitled to class discovery unless it's -- there's some

25  reason that they're not.  So you can go ahead and make that

1    argument, but for the time being I'm going to order it.

2         You're going to make a motion for class certification.

3    You're going to oppose class certification on the consent issue

4    or you're going to contest it on the merits on the consent

5    issue?

6         MR. REIF:  It will be both, your Honor.  Again, we do

7    believe that there was consent all the time.  We think that in

8    the case of Mr. Johansen that there was consent, but it comes

9    down to -- I mean, one of our major arguments in class cert

10   opposition would be exactly what Mr. Batson said, is that this

11   is a matter of mini trials in part because a person could be on

12   the do-not-call list and could have ended up in Liberty's call

13   records because they made this call coming in.

14        And so to go through and figure out -- even if they do

15   their scrubbing and they end up with a list of people that are

16   on the national do-not-call list and they ended up in Liberty's

17   call database, there's no way of saying that those people

18   represent a violation of the TCPA without going through and

19   figuring out in each case whether they gave consent or whether

20   they had made the call themselves.

21        THE COURT:  All right.  Well, help me out here.  I

22   want to limit his discovery on Precise Leads.  It does seem

23   it's going to be a huge cost and huge amount of work to do it

24   without knowing who he's looking for.

25        MR. BRODERICK:  Well, I mean, they're asking to not

1  have to produce the evidence of consent, in essence; that is,

2  that supposedly --

3         THE COURT:  What are you asking for?

4         MR. BRODERICK:  We've said provide all evidence that

5  any of these people that were called consented to that.

6         THE COURT:  So leads that they have related to

7  Liberty?

8         MR. BRODERICK:  Yes.

9         THE COURT:  Limited to Liberty?

10        MR. BRODERICK:  Well, the marketing is -- can be on

11 behalf of multiple insurance companies, but we say if you're in

12 that group, you're jointly and severally liable for those

13 calls.  Now, some may be limited to Liberty.  Sometimes there

14 are dedicated campaigns.  But we're sort of arguing in a black

15 box about what they should have to produce.  We think they

16 should have to respond to our discovery requests and not modify

17 them in advance, and we can actually have an idea of what they

18 did produce and what they didn't produce.

19        But you can't say there's going to be a thousand mini

20 trials because of our affirmative defense but we're not going

21 to show you what the consent evidence is.  Just take our word

22 for it that there's consent evidence out there, particularly

23 where Johansen --

24        THE COURT:  I want to get you consent evidence, but I

25 don't want to get you the class evidence on a much broader

1    group than the class is going to ultimately be.

2         MR. BATSON:  And, your Honor, we're going to provide

3    him -- in fact, some of it might already have been produced by

4    Liberty Mutual, but we're going to provide him the evidence

5    that we have with respect to Mr. Johansen.  We're not asking to

6    limit that at all.  The problem is when you get into -- if you

7    just want consent evidence for every other person that was

8    involved in even just Liberty Mutual's campaign, it doesn't

9    separate that way.  If you do one, you do everything.

10         THE COURT:  What I want to find a way to do -- and

11   again, this is not my area of expertise so you can tell me if

12   I'm totally barking up the wrong tree, but I would like to find

13   a way where he produces to you his information on people that

14   are on the do-not-call list and not his information on the

15   entire universe.

16         MR. BATSON:  That is a larger expense than just

17   pulling out the data, your Honor.  If that is -- if the

18   original issue is not proportional, then that just blows up the

19   expense.  I mean, get the data and then have an expert go in

20   and --

21         THE COURT:  No.  No, I'm trying the other way:

22   Identify who's on the do-not-call list and then --

23         MR. BATSON:  Oh, from whatever's produced by --

24         THE COURT:  Yes.

25         MR. BATSON:  I would have to check with my client, but

1    that is certainly less of a burden than having to do it on a

2    much larger basis.  And I will just say this is part of the

3    problem -- and I agree, it's a little bit premature to be

4    talking about individualized discovery because we haven't

5    served it yet, our responses yet, but this is as classic a

6    fishing expedition as you can possibly get.  It's we've got

7    Johansen, we've got problems with Johansen, let's see if we've

8    got somebody else out there when Johansen is gone, and so just

9    give me everything you have about anything you've ever done

10   with respect to anybody and hopefully, even if this class

11   action doesn't work, maybe we'll be able, to use the phrase,

12   gin up another one.

13        And, you know, this suggestion, by the way, that we

14   gin up data, I would say, is preposterous.  I mean, there's no

15   evidence of that.  The evidence that we have with respect to

16   Mr. Johansen, even if he wants to dispute it, is information

17   that we believe is sound and solid.  And that would be --

18        THE COURT:  Mr. Broderick is regretting the use of the

19   term "gin up" but I take his point.

20        MR. BRODERICK:  Well, I have seen it ginned up in

21   other cases.  I don't actually regret it.  But I didn't say it

22   about Precise Leads because I don't know.  I haven't gotten

23   their response.

24        THE COURT:  So this is what I'm envisioning, and you

25   can tell me how I have this not right.  But you get a list of

1    people from, say, Liberty, right?  Is there call information

2    coming from other sources besides Liberty?

3         MR. BRODERICK:  We hope so, from some of these

4    third-party subpoena responses.

5         THE COURT:  You get a list of calls, you figure out

6    who on that list is on the do-not-call list, and then he

7    responds to that list.

8         MR. BRODERICK:  That's possible.  But, you know, part

9    of the problem is that if you're calling people on the basis of

10   this consent, we'd like to be able to test the consent pretty

11   broadly.  But it may be that our do-not-call list works but if

12   there is -- if it's riddled with IP addresses that don't match

13   the people who supposedly consented, you know, or in the

14   Johansen's case, both that and the address is wrong and they're

15   shown as having a car they don't own --

16        THE COURT:  It doesn't matter.  If they're on the

17   do-not-call list, it doesn't matter.

18        MR. BRODERICK:  That's true.  That's true.  And that

19   may be a fine solution, it's just it's a little bit hard to see

20   how that all works in a sequenced way within a 60-day discovery

21   period.  And if it's going to take that long to get --

22        THE COURT:  You mean an extra 60 days?  If he gives

23   you the list of people on the do-not-call list, how long does

24   it take your people to extract that data?

25        MR. BATSON:  I don't know, your Honor.  Right now

1   there is a request right now to figure out how we get to that

2   data.  So, I mean, I will tell you the data that we are going

3   to have is going to say that there was consent.  To actually

4   track down the specific data -- let's just say he gives me ten

5   calls, right, that are on the do-not-call list and that they

6   want data for, and that fit into the -- by the way, the two

7   calls within a 12-month period because that's part of it as

8   well.  It's not just a call, it's two calls.

9        So if he gives me a list and there are ten people, I'm

10  going to provide him with consent to ten people because that's

11  our business.  We don't do this unless there's consent.  He may

12  want to challenge the sufficiency of it, but that's the nature

13  of our business.  So everybody's going to have consent.

14       I'm then going to have to have my client go data mine

15  to find information because you may be talking about a call

16  from -- if you're talking about a call from 2014, for example,

17  that data is no longer on their main system.  If you're talking

18  about a call from a month ago, it may already be archived

19  because of the nature of what they're doing.

20       So it really depends on how many he gives me, and I am

21  working on figuring out the cost to actually get that

22  information out of archives.

23       THE COURT:  Okay.  Forget about the cost for the

24  moment.

25       MR. BATSON:  Time-wise?

1            THE COURT:  Time.

2            MR. BATSON:  I don't know.  It depends on how many

3    there are, but I have to imagine it can be done in less than 30

4    days, maybe even quicker than that.  I'm not sure whether it's

5    necessary to extend the deadline just for that.

6            THE COURT:  So I'm going to -- I think you all

7    understand my vision and what we're aiming for.  Given 60 days

8    that I didn't want to give, so now everybody has a lot more

9    time, we'll get your motion done, so let's try and -- let's try

10   and do it that way, okay?  You get the numbers and you give him

11   people that you can identify on the do-not-call list and you

12   try and turn it around quickly.

13           MR. DOCKTERMAN:  And, your Honor, I just don't want --

14   I'm loathe to say anything, but I don't want the assumptions to

15   be otherwise.  You could see I'm trying to get this off your

16   docket.

17           THE COURT:  You're so benevolent.

18           MR. DOCKTERMAN:  We have no information that is

19   responsive along these lines.  We were hired to do ad

20   campaigns.  We hired Spanish Quotes to do all of this stuff.

21   So to the extent that there's any call information, you've

22   already spoken to Mr. Stafford about that.  And to the extent

23   that there would have been anything that would have come at our

24   instance, that would have been it.

25           But we're here because we gave them an indemnity and

1  Spanish Quotes gave us an indemnity, and Spanish Quotes isn't

2  living up to their indemnity to us if they have to do anything.

3  I just don't want anybody to expect any documents from us.

4       THE COURT:  You expecting documents from him?

5       MR. BRODERICK:  Well, what I've seen from their master

6  services agreement, they actually managed the relationships

7  with some of these aggregators.  And this is without the

8  benefit of discovery response, but I thought that they were

9  helping them track the efficiency of some of these campaigns,

10  how much they were spending, and that that implies to me that

11  they have access to this Invoca system.

12       Our uninformed understanding is that that's a hub that

13  a lot of these people can tap into to get -- extract data about

14  what calls were made, who made them, who transferred it to whom

15  and who gets paid by whom, you know?  So it's a complicated

16  system but it's -- I don't want to concede that, yes, I'm not

17  expecting documents because I'm not sure that that's --

18       THE COURT:  Are you telling him you have no responsive

19  documents?

20       MR. DOCKTERMAN:  Not to this issue.  That's correct,

21  your Honor.

22       THE COURT:  He said he has no responsive documents.

23       MR. BRODERICK:  No call records or no other types of

24  documents?

25       THE COURT:  No call records?

1    MR. DOCKTERMAN:  No call documents.

2    MR. BRODERICK:  Well, we'll see in the discovery

3    responses to individual requests.  As I say --

4    THE COURT:  You still have to respond.

5    MR. DOCKTERMAN:  Oh, of course.  Understood.  But I

6    just want it to be clear if somebody comes back and says, Hey,

7    wait a minute, we didn't get anything from Digitas, everybody

8    should know right now as far as call records and all the things

9    that have been discussed right here, that's not going to come

10   from us.

11   THE COURT:  You're in a sad and unfortunate position,

12   aren't you?

13   MR. DOCKTERMAN:  It's terrible, your Honor.  Terrible.

14   But what I have done is I've put some money someplace to make

15   it go away, so that makes me less sad.

16   THE COURT:  Mr. Johansen doesn't think you put aside

17   enough money to make it go away.

18   MR. DOCKTERMAN:  Well, that's something that the Court

19   will decide.  If there's more that we need to put in there,

20   I'll put it in, but I gave him every penny that he identified

21   in his answers to interrogatories.

22   MR. BRODERICK:  And not a thin nickel for the class.

23   MR. BATSON:  There is none.

24   MR. DOCKTERMAN:  Thank you.

25   THE COURT:  Is there anything else we could do today?

1   I'm not sure how we're going to get this into an order

2   because --

3         MR. BATSON:  We all understand, your Honor.

4         THE COURT:  I think everybody should understand.

5         MR. BRODERICK:  I don't know that there's anything

6   else we can do.  I just want to express my hesitation that

7   putting consent after the assembly of the call records and

8   the -- you know, that sort of -- that all happens at the point

9   of an expert analyzing all the records that we have and

10   that -- so we would have to have some cushion to challenge

11   whatever the consent evidence is because we'd be -- you know,

12   it's not like we're going to have an expert report in two weeks

13   and then we could give it to them and before the end of the

14   discovery period we give consent.

15         THE COURT:  I get it.  Look, I haven't been doing this

16   that long.  I don't know much about this kind of case.  The

17   cases that I have seen in this genre moving across my desk end

18   up with -- the costs of the case end up hugely disproportionate

19   to the recovery, and I am very interested in finding ways to

20   make that not happen.

21         I have a case right now that we just got a settlement

22   agreement -- there's a settlement agreement, but the amount to

23   the lawyers is three times the amount to the class.  And I

24   am -- and there's new civil rules that give me a little bit

25   more latitude to manage these things and I am trying to find

1    ways to effectively manage it.

2         So if this turns out to be a disaster, I will give you

3    more time and we can regroup, but I want to keep it efficient

4    and I want to keep whatever recovery is made -- I want to keep

5    the legal fees proportionate to the potential recovery.  And

6    I -- from my days in private practice, I know what he's talking

7    about, about how expensive discovery can get trying to go back

8    on archived data, so I want you to have the data to which

9    you're entitled, but I would like to figure out a way that you

10   only get the relevant data.  And so if that requires me to end

11   up adding another 30 days to this, so be it.

12        MR. BRODERICK:  Understood, your Honor.  That's

13   my -- because just having done it enough times, it's --

14        THE COURT:  Well, I haven't done it that many times --

15        MR. BRODERICK:  Right.

16        THE COURT:  -- and I may be barking up a bad tree, but

17   I'm interested in exploring different ways of getting you and

18   your client whatever they're entitled to but in an efficient

19   way.  So if I have -- if it is a poor idea, we will all find

20   out shortly, and I don't think it will cost too much extra

21   money because it just means he has to go back to his well.

22        MR. BRODERICK:  Understood, your Honor.  And we're

23   perfectly willing -- if you do want to have oral argument, we'd

24   welcome the chance on the *Campbell-Ewald* issue.  It is an

25   interesting issue and we've dealt with it a number of times, so

```
 1   we're happy to appear.
 2            THE COURT:  I mean, the briefing was very good.  I
 3   mean, I thought the briefing was very good unencumbered by
 4   having read the cases, I guess.
 5            MR. DOCKTERMAN:  If only they said what we said they
 6   said.
 7            THE COURT:  Yeah.  I mean, it's all well said, they're
 8   cogent arguments.  And it's very good briefing.  And so if I
 9   have any questions, I'll bring you in about it.  You know, it's
10   obviously sort of an evolving -- here's another place where I
11   may or may not get it right, but I'll at least do my best to
12   move you along.
13            MR. BRODERICK:  Okay.  Thank you.
14            MR. DOCKTERMAN:  It is a brand-new issue, your Honor,
15   because, really, the *Gomez* decision, or *Campbell-Ewald*, opened
16   this door only a few months ago.  And the majority opinion and
17   the Thomas concurrent both laid out a path which we tried to
18   follow.  You will be one of the first to address this issue,
19   which could be exciting and also could be --
20            THE COURT:  But the court doesn't say it's a path, the
21   court in its imminent wisdom says it might be a path which is
22   not wholly --
23            MR. BRODERICK:  Right.  And what it does say
24   unequivocally is you have to get a shot at class certification.
25   And that's the heart of it from our perspective.
```

1          MR. DOCKTERMAN:  Yeah, that's one of the reasons why

2     different people read the case different ways, and the Court

3     will make --

4          THE COURT:  You'll get your shot at class

5     certification but perhaps not with Mr. Johansen, who I hope is

6     out developing a hobby this weekend.

7          MR. DOCKTERMAN:  Thank you very much, your Honor.

8          THE COURT:  Anything else today?

9          MR. BRODERICK:  No, your Honor.

10         MR. DOCKTERMAN:  No, your Honor.

11         THE COURT:  Thanks, everyone.  Have a good weekend.

12         COUNSEL IN UNISON:  Have a good weekend.

13         THE CLERK:  All rise.

14         (The Court exits the courtroom and the proceedings

15    adjourned at 10:25 a.m.)

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4    the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of Civil Action No. 15-12920-ADB,

8    Johansen, et al. v. Liberty Mutual Group, et al.

9

10   /s/ Marcia G. Patrisso
     MARCIA G. PATRISSO, RMR, CRR
11   Official Court Reporter

12
     Date:  6/13/16
13

14

15

16

17

18

19

20

21

22

23

24

25