1                UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3

4 KEN JOHANSEN, individually and

5 on behalf of all others similarly

6 situated,                       Civil Action No.

7          Plaintiff,         1:15-cv-12920-ADB

8       vs.

9 LIBERTY MUTUAL GROUP INC.; and

10 SPANISH QUOTES, INC. d/b/a

11 WESPEAKINSURANCE,

12          Defendants,

13 LIBERTY MUTUAL GROUP, INC.,

14          Crossclaimant,

15       v.

16 SPANISH QUOTES, INC. d/b/a

17 WESPEAKINSURANCE,

18          Crossdefendant,

19 LIBERTY MUTUAL GROUP, INC.,

20 LIBERTY MUTUAL INSURANCE COMPANY,

21          Third-Party Plaintiffs,

22       v.

23 PRECISE LEADS, INC., and DIGITAS, INC.

24          Third-Party Defendants.

25

1

2      DEPOSITION OF KENNETH W. JOHANSEN, a

3 witness called on behalf of Liberty Mutual Group,

4 Inc., and Liberty Mutual Insurance Company, taken

5 pursuant to the applicable provisions of the Federal

6 Rules of Civil Procedure before Cynthia A. Powers,

7 Shorthand Reporter and Notary Public in and for the

8 Commonwealth of Massachusetts, at the law offices of

9 Robins Kaplan LLP, 800 Boylston Street, Boston,

10 Massachusetts, on Thursday, May 26, 2016, commencing

11 at 8:12 a.m.

12

13

14

15 APPEARANCES:

16     Matthew P. McCue, Esquire

17     Law Office of Matthew P. McCue

18     1 South Avenue, Third Floor

19     Natick, Massachusetts 01760

20     (508) 655-1415

21     mmccue@massattorneys.net

22     Representing Ken Johansen, individually

23     and all others similarly situated

24

25

---

1 APPEARANCES (Cont.):

2     Michael D. Reif, Esquire

3     Robins Kaplan LLP

4     800 LaSalle Avenue, Suite 2800

5     Minneapolis, Minnesota 55402

6     (612) 349-0171

7     mreif@robinskaplan.com

8     Representing Liberty Mutual Group Inc.

9     and Liberty Mutual Insurance Company

10

11     Manleen Singh, Esquire

12     800 Boylston Street, Suite 2500

13     Boston, Massachusetts 02109

14     (617) 859-2767

15     msingh@robinskaplan.com

16     Representing Liberty Mutual Group Inc.

17     and Liberty Mutual Insurance Company

18

19

20

21

22

23

24

25

---

1 APPEARANCES (Cont.):

2     Michael S. Batson, Esquire

3     Hermes Netburn

4     265 Franklin Street, 7th Floor

5     Boston, Massachusetts 02110

6     (617) 210-7745

7     mbatson@hermesnetburn.com

8     Representing Third-Party Defendant

9     Precise Leads, Inc.

10

11     Lauren E. Jaffe, Esquire

12     Steptoe & Johnson LLP

13     115 South LaSalle Street, Suite 3100

14     Chicago, Illinios 60603

15     (312) 577-1258

16     ljaffe@steptoe.com

17     Representing Third-Party Defendant

18     Digitas, Inc.

19

20

21

22

23

24

25

---

1         I N D E X

2                        Page

3 Examination by Mr. Reif       7, 233

4 Examination by Mr. Batson    199

5 Examination by Mr. McCue     228

6 Afternoon Session         199

7

8

9        E X H I B I T S

10 Number                     Page

11 Exhibit 1    AutoQuotesDirect.com Web Page   38

12            Printout

13 Exhibit 2    Call Log (614)791-1037   40

14 Exhibit 3    Call Log Liberty Mutual 2  66

15 Exhibit 4    Call Sheet Liberty Mutual  73

16            Summary

17 Exhibit 5    Transcript of 12/23/14 Call  85

18 Exhibit 6    Transcript of 12/24/14 Call  109

19 Exhibit 7    Transcript of 12/24/14 Call  123

20 Exhibit 8    Transcript of 2/17/15 Call  125

21 Exhibit 9    Transcript of 2/18/15 Call  125

22 Exhibit 10   Transcript of 2/18/15 Call  125

23 Exhibit 11   Transcript of 2/20/15 Call  125

24 Exhibit 12   Transcript of 3/16/15 Call  126

25

```
 1           E X H I B I T S  (Cont.)
 2 Number                                      Page
 3 Exhibit 13   CASE Network Records Search     178
 4 Exhibit 14   Letter, 3/4/15                  207
 5 Exhibit 15   Defendant Liberty Mutual Group  212
 6              Inc.'s First Set of
 7              Interrogatories and Plaintiff's
 8              Objections and Answers Thereto
 9 Exhibit 16   Verification, 5/2/16            212
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1           P R O C E E D I N G S
 2           KENNETH W. JOHANSEN,
 3
 4      having been satisfactorily identified
 5      and duly sworn by the Notary Public,
 6      was examined and testified as follows:
 7
 8           DIRECT EXAMINATION
 9 BY MR. REIF:
10    Q.   Good morning, Mr. Johansen.  My name is
11 Michael Reif.  I'm with Robins Kaplan.  I
12 represent Liberty Mutual.  We're going to be
13 asking you some questions.  I think some of the
14 other counsel will have some questions for you,
15 too.  We will try to get through this as quickly
16 as we can.
17           Just to begin, can you start by telling
18 me in your own words what your lawsuit is about?
19    A.   I received calls, telemarketing calls,
20 on my home telephone number and was connected
21 with a Liberty Mutual agent, contacted Liberty
22 Mutual, asked them if they had consent to use my
23 telephone number and then contacted the law firm
24 and said that I want to file a case against you.
25    Q.   We'll start with some background
```

```
 1 information before we get too much into the
 2 substance.
 3           Can you state your full name for the
 4 record, please?
 5    A.   Kenneth Wayne Johansen.
 6    Q.   Okay.  What's your birthday?
 7    A.   September 18, 1949.
 8    Q.   What is your current address?
 9    A.   5202 Avery Oak Drive, Dublin, Ohio
10 03016.
11    Q.   How long have you been there?
12    A.   A little under three years.
13    Q.   Where were you before then?
14    A.   Prior to that I was at 8822 Turin Hill
15 Court South, Dublin, Ohio, 43017.
16    Q.   What's your telephone number?
17    A.   My home phone number is (614)791-1037.
18    Q.   How long have you had that number?
19    A.   About -- should be thirty years,
20 twenty-five years.
21    Q.   You said, "home number."  Do you also
22 have a cell phone?
23    A.   I do.
24    Q.   Do you use it?
25    A.   Yes.
```

```
 1    Q.   What is that number?
 2    A.   (614)531-1022.
 3    Q.   Do you have any other telephone numbers
 4 that you answer regularly?
 5    A.   No.  My wife has a cell.
 6    Q.   Okay.  You mentioned your wife.  You're
 7 married to Rita Johansen?
 8    A.   Correct.
 9    Q.   Do you have any children?
10    A.   We have three.
11    Q.   What are their names?
12    A.   Matthew, Michael and John.
13    Q.   How long have you been married to Rita?
14    A.   Oh.
15    Q.   A little bit of a test to get started.
16    A.   Forty-three years.
17    Q.   Have you always lived in Ohio?
18    A.   No.
19    Q.   Where were you born?
20    A.   Born in Indiana.
21    Q.   When did you move?
22    A.   We moved to Ohio, about 1990.
23    Q.   Can you walk me through your
24 educational background since high school, please?
25    A.   Sure, attended Purdue, got a BS in
```

1    Q.   Mr. Johansen, what did you do to
2  prepare for the deposition today?
3    A.   I reviewed the claim.  I reviewed the
4  interrogatory responses.
5    Q.   Did you meet with --
6    A.   Talked to Matt.
7    Q.   You talked to your counsel?
8    A.   Yes.
9    Q.   How long did you talk with your
10 counsel?
11   A.   Two hours or so.
12   Q.   When did you do that?
13   A.   Last night.
14   Q.   Did you speak with anyone else about
15 this deposition?
16   A.   I worked with Anthony Paronich, and
17 he's been my primary contact on the case.
18   Q.   When you say you "worked with" him,
19 does that mean you spoke with him?
20   A.   I spoke with him, yeah.  He informed me
21 of the deposition, and we discussed Matt's
22 involvement.
23   Q.   Was it more logistics with Mr. Paronich
24 or was it substance?
25   A.   Both.

1    Q.   When did you speak with Mr. Paronich?
2    A.   Actually e-mailed -- that was an e-mail
3  contact, and it was primarily just that the
4  deposition would take place.
5    Q.   Did you speak with your wife at all
6  about today's deposition?
7    A.   Related to logistics and the issues
8  that are involved.
9    Q.   You said that you reviewed the
10 complaint and also the interrogatory answers; is
11 that correct?
12   A.   That's correct.
13   Q.   Did you review anything else?
14   A.   Hum, not that I know of.
15   Q.   You have a folder with you today?
16   A.   Yes.
17   Q.   Did you bring any documents with you
18 today?
19   A.   Yeah, I have a copy of the
20 interrogatory responses and the claim.
21   Q.   Okay.
22   A.   That's it.
23   Q.   Did you review any recordings in
24 preparation for the deposition today?
25   A.   Yes, I did.  I also have the Liberty

1  Mutual response.
2    Q.   Okay.  Which recordings did you listen
3  to?
4    A.   Most of them, the seven contact calls
5  and some of the follow-up calls related to those.
6    Q.   Are those recordings still on a
7  computer or other device that you have right now?
8    A.   No.
9    Q.   Where are those --
10   A.   They are on a computer.  I've got them
11 on a -- they're on the hard drive.  Actually,
12 yeah, they're stored on my computer.
13   Q.   Help me understand.  I asked if they
14 were on computer, and you said, "No."
15   A.   I thought you were saying did I have
16 them on a computer here.
17   Q.   All right, not in the room.
18   A.   I don't have them here.
19   Q.   That's where they were, and that's how
20 you listened to them?
21   A.   Recordings are saved on the hard drive
22 of my computer.
23   Q.   I see, obviously, Mr. McCue is here
24 with you today.  Do you have an engagement
25 agreement with Mr. McCue?

1    A.   My agreement is with Paronich and
2  Broderick.
3    Q.   How did that come about?
4    A.   It's a long story.  I have received
5  telemarketing calls for the last many years.
6  When I retired, I became frustrated with the
7  number of calls that I received and how to handle
8  the myriad of intrusions into our lifestyle.
9         I got particularly frustrated with it
10 toward the beginning of 2014 and tried to do
11 something about it, eventually stumbled on a Web
12 site that, you know, how to stop telemarketers.
13        Prior to that time, I had registered my
14 phone number, of course, with the National
15 Do-Not-Call list.  For several years I tried
16 filing complaints with the FCC on their Web site
17 on calls that I received, which seemed totally
18 ineffective.  Obviously, I asked callers not to
19 call again.  That was totally ineffective.
20        Eventually, in 2014, I stumbled on a
21 Web site that said -- that talked about the FCC,
22 TCPA regulations and about how to sue
23 telemarketers.
24        I filed a couple of small claims cases
25 on callers that I could identify; that was

1 early -- that was middle of the 2014, then
2 casually asked some tennis acquaintances, who
3 were attorneys, I was -- approached trial on a
4 small claims case. What do I do now? I'm not an
5 attorney. I don't have any particular real
6 expertise.
7      I talked to an attorney and said, Is
8 there anybody who does this? Is there any place
9 I could get help? They told me about a gentleman
10 in Columbus, whose name is Phil Charvat, and
11 indicated that he had significant legal
12 experience, not an attorney obviously, but
13 personal experience with TCPA cases.
14      So I contacted Phil and asked him about
15 my issues, discussed the TCPA situation, and he
16 advised me to talk to Anthony.
17      Q.   This was late 2014?
18      A.   That was late 2014, yes, yes. So then
19 I had further contact with Anthony and talked to
20 him about class action cases.
21      Go back a little bit and say that as
22 I -- with the initial TCPA small claims cases, I
23 discovered that I needed evidence and how -- a
24 little bit about how the procedure works. So in
25 December of 2014 I purchased a call recording

1 machine, which will record my phone calls.
2      Q.   Can you tell me a little bit more about
3 that machine?
4      A.   It hooks into the phone line, records
5 the calls as they -- incoming and outgoing calls.
6      Q.   Where do the recordings go?
7      A.   They go onto a chip, memory chip, that
8 goes into the machine.
9      Q.   Can you download recordings off that
10 chip?
11      A.   Yes.
12      Q.   How does that work.
13      A.   You copy the chip -- you take the chip
14 and copy it to the computer. I also have the
15 original chip of the calls. I can't edit the
16 recordings. I can make notes related to the
17 recordings.
18      Q.   When you say you can make notes --
19      A.   There's a memo feature on the -- on the
20 playback system where you can enter information
21 related to the call. For example, when I get a
22 call from Liberty Mutual, I'll put a Liberty
23 Mutual note on the call so that it will be a
24 search characteristic.
25      Q.   So is there an application on your

1 computer that this hooks into --
2      A.   Yes.
3      Q.   -- where you're making notes?
4      A.   Well, yeah, exactly.
5      Q.   What's the name of that?
6      A.   It's XRT for -- not sure what it's
7 called. It's a software program that allows you
8 to listen to the recordings and search them. The
9 recorder does not have any editing capability
10 or -- it can only play back.
11      Q.   So the recorder does the recording; you
12 can't edit that, but when you upload it, you have
13 the ability to make notes about it for searching
14 purposes?
15      A.   Correct.
16      Q.   Can you control whether the machine
17 turns on or off when a call comes in or do you
18 have it on all the time?
19      A.   I can control it. You can stop the
20 recording any time.
21      Q.   You can stop the recording, but does it
22 start --
23      A.   Starts automatically.
24      Q.   For every call?
25      A.   For every call.

1      Q.   Did you purchase this software, this
2 system, on your own or at the advice of someone?
3      A.   On my own.
4      Q.   Did you find it on your own or did
5 someone recommend this one?
6      A.   I found it online.
7      Q.   Have you ever met the other attorneys
8 working for you on this case?
9      A.   No. I met Anthony and Matthew.
10      Q.   You haven't met anyone at the Terrell
11 Marshall firm?
12      A.   I'm not familiar with them.
13      Q.   Have you spoken with them at all?
14      A.   I have not.
15      Q.   Have you ever e-mailed with them?
16      A.   I have not.
17      Q.   Do you know how they came to be
18 associated with this case?
19      A.   Not particularly. I know that Anthony
20 and Broderick work with other attorneys on
21 related cases.
22      Q.   Was it your idea to file this
23 particular lawsuit against Liberty Mutual?
24      A.   I provided Anthony with the data that I
25 had on Liberty Mutual and asked him if it was

1    Q.   Do you know whether she does comparison
2  shopping --
3    A.   Yes.
4    Q.   -- online?
5    A.   Mm-hmm.
6    Q.   Have you ever spoken to her about what
7  kind of stuff she's looking for?
8    A.   We talk.
9    Q.   Have you talked about this?
10   A.   About?
11   Q.   About comparison shopping on the
12  Internet?
13   A.   Yes.
14   Q.   Have you ever used a search engine to
15  search for auto insurance companies?
16   A.   Not that I can recall.
17   Q.   Have you ever visited Web sites for
18  auto insurance companies?
19   A.   Not that I can recall.
20   Q.   Are you familiar with the Web site
21  AutoQuotesDirect.com?
22   A.   No, other than it's referenced in
23  interrogatories, I think.
24        (Marked Exhibit 1, AutoQuotesDirect
25        Web Page Printout)

1    Q.   Show you what we've marked as
2  Exhibit 1.  Exhibit 1 is Bates labeled LM00208.
3  That's the numbers at the bottom.  We use them
4  just for reference.
5        Have you ever seen this?  This is a
6  printout of a computer screen.  Have you ever
7  seen this screen or something like this before?
8    A.   Not that I'm familiar with.
9    Q.   Because you're not familiar with it, is
10  it fair that you haven't entered information into
11  a Web site that looks something like this?
12   A.   Not that I can recall at all.
13   Q.   When you were talking about the cars
14  that you owned, did you ever own a 2003 Honda
15  Accord?
16   A.   Nope.
17   Q.   You said that you may have -- you
18  remember Farm Bureau Insurance being around
19  Indiana, but you don't remember having a policy
20  through them?
21   A.   I can't tell you if our policy was
22  through them.
23   Q.   What's your wife's birthday?
24   A.   January 16, 1949.
25        MR. REIF:  We've been going for an

1  hour.  Let's take a little break.
2        MR. McCUE:  Sure.
3        (Recess taken)
4  BY MR. REIF:
5    Q.   Mr. Johansen, let's talk now about some
6  of the call logs that you've kept and that you
7  produced in this case.  I'm going to show you --
8  I'll mark as Exhibit 2 a document Bates numbered
9  PLFF 7 through 11.
10        (Marked Exhibit 2, Call Log
11        (614)791-1037)
12   A.   Thank you.
13   Q.   Take a look at that please.
14   A.   (Deponent viewing exhibit).
15        Number nine is at the very back.
16   Q.   That's what I saw.  Can you tell me
17  what this is?
18   A.   That's my call log.
19   Q.   That's your call log.  This is the call
20  log we had talked about?
21   A.   Yes, this is every -- every call that I
22  get and save, I will document the time and date
23  and phone number and any other notes that I feel
24  are appropriate.
25   Q.   Walk me through the heading on top,

1  please.
2    A.   We have the date that the sheet covers,
3  call number, page number, then I log the date,
4  the time, the caller ID, whether the call was
5  answered or outgoing or not answered, whether the
6  call included a recorded message.
7    Q.   Let me stop you there.  When you say
8  "recorded message," what do you mean by that?
9    A.   That would be a robo message, a
10  recorded message or a computer simulated
11  recording, computer simulated voice.
12   Q.   And that --
13   A.   By that I mean the responses of the
14  computer where if you ask if it's a nice day, and
15  they'll say, Yes, it's a nice day, and are you
16  doing well, too.
17   Q.   Your determination of that is
18  subjective, but you have enough familiarity that
19  you feel confident about --
20   A.   After I got fooled once or twice, I got
21  better.
22   Q.   Beyond that?
23   A.   The next two columns generally will --
24  I use that as just a reference to screen back to
25  the calls.

1    Q.   What do you mean by that?

2    A.   Well, I mean, the column, the next two

3  columns are a little ambiguous and not

4  necessarily consistent with my record keeping

5  system.  If I can identify the company, I might

6  have that information down.  If the -- if the

7  call is related to a company, I might have that

8  information down.  Sometimes I use the business

9  column.  Sometimes I don't.  Most of the time I

10 don't.

11   Q.   How did you make the determination

12 about which company a call is from or related to?

13   A.   The sheet is primarily as a sorting or

14 checking tool to use to see whether I've received

15 more than one call.  Obviously, for a TCPA claim

16 on a land line, I need more than one call within

17 a twelve-month period.  I'm trying to have that

18 column work to identify whether I received a

19 second call from somebody.

20   Q.   How did you first come to find out

21 about the TCPA?

22   A.   That was when I failed my first --

23 well, I guess I found out about it when I entered

24 my number on the do-not-call log, but essentially

25 I got seriously involved when I filed the first

1  small claims case.

2    Q.   How did you come to learn about that

3  particular law?

4    A.   Oh, probably a Web search.

5    Q.   Do you remember what kind of

6  information popped up?

7    A.   Yeah, it was a -- I think it was a

8  YouTube video about a guy saying -- let's see,

9  just saying what the telemarketer had to do to

10 make a legal phone call.  It was a particularly

11 good Web site.  I've learned, but it did get me

12 started.

13        Continuing with the notes, they are

14 just whatever seems relevant about the call that

15 might be needed later.  It's very difficult to go

16 back and review a call if you don't know exactly

17 which call it is.

18        I get probably four hundred

19 telemarketing calls a year.  In 2015, I got four

20 hundred calls.  In 2014, I probably had that many

21 or more, which is why I got excited about it.

22   Q.   When you say "excited about it," you

23 were upset about it?

24   A.   Upset about it.  It's intrusive.

25   Q.   Do you log every call that comes in?

1    A.   I don't log personal calls.

2    Q.   You record some personal calls though;

3  correct?

4    A.   There are recorded, but generally

5  deleted.

6    Q.   So you --

7    A.   I have to live with her.

8    Q.   You said that you can't edit calls that

9  are recorded, but you can delete calls?

10   A.   I can delete them.  And I also get the

11 time and date and caller ID saved with the file.

12   Q.   That comes with the recording file as

13 well?

14   A.   Yes.  If you look at the recording file

15 data, it's coded with the date and time of the

16 call also with whether it was an outgoing or

17 incoming call.

18   Q.   Did anyone tell you to start keeping

19 this log?

20   A.   Hum, I'm not sure how that started.

21 It's partially -- just I've seen call logs before

22 and business call logs.  It became obvious after

23 the first lawsuits that I needed to have a system

24 that would allow control of the evidence.

25   Q.   When you say "the first lawsuits,"

1  these are your small claims lawsuits?

2    A.   Correct.

3    Q.   Those are starting in late 2014?

4    A.   Yes.

5    Q.   Do you remember exactly when you

6  started keeping this call log?

7    A.   On page one.

8    Q.   Okay.

9    A.   Which would be early November, I

10 believe.  The original call log was a ring

11 binder, not a ring binder but a spiral notebook

12 with the date and notes on calls.  This one

13 evolved.

14   Q.   Do you still have that original

15 notebook?

16   A.   Yes, I do.  That one started mid-'14, I

17 think.  Actually, that probably has notes on

18 calls prior to that.  It took me a while to get

19 mad enough to finally file a case.

20   Q.   Your notes may stretch back to 2013?

21   A.   May.

22   Q.   Is the writing on this log your

23 handwriting?

24   A.   Correct.

25   Q.   Does anyone else in your house log

1  calls on here?

2    A.    No.

3    Q.    You mentioned page one, which we don't

4  have.

5    A.    Correct.

6    Q.    Do you know how many pages you have

7  total in your log?

8    A.    Today, I think, we're about ninety.

9    Q.    Did you yourself come up with the

10  format of this call log?

11    A.    Yes, it's an Excel spreadsheet.

12    Q.    I see at the bottom some small print

13  above the Bates stamp.

14    A.    Yes.

15    Q.    Can you tell me what that is?

16    A.    That's the date -- let's see, that's

17  the date that the sheet was printed.

18    Q.    And then above it there's a label of

19  some sort.

20    A.    That's the file name.  It's an Excel

21  file and date, automatic format.

22    Q.    It looks like there are two different

23  kinds.  You have "CallLogSheet1" and there's

24  "CallLogSheetASheet1."

25    A.    You'll notice that sheet one has twelve

1  calls on it.  It was upgraded an eighteen sheet

2  log.  After about page ten, I said, More calls

3  per sheet is better.

4    Q.    Like you said, iterative process.

5    A.    Tried to make it useful, searchable.

6    Q.    You referenced this already that page

7  nine is at the back of these.

8    A.    Yep.

9    Q.    It looks like if you flip to that, it's

10  a Bates stamp 11 at the top.  It looks like it's

11  not just nine but is it H or 9A?

12    A.    Oh, yeah, 9A.  I probably had two page

13  nines and that happened after page ten was

14  written and I had to come up with some kind of

15  order system.  9A was after eight.  There's

16  probably a 9B and a ten that was misnumbered.

17    Q.    When are you physically making these

18  recordings in relation to when you received a

19  call?

20    A.    The recording is made during the call,

21  obviously.  The call log is done periodically

22  when I have time to listen to the recordings and

23  enter the log.  The numbers on the log sheet

24  should be consistent with the numbers on the

25  computer file.

1    Q.    Can you give me a rough estimate of the

2  normal time between when you actually receive a

3  call and when you go back and listen to the

4  recordings and fill the sheet out?

5    A.    Yeah, probably five days.

6    Q.    Is it your normal process to go through

7  a batch every five days or so --

8    A.    Exactly.

9    Q.    -- fill out the log and then move on

10  with your life?

11    A.    That's right.

12    Q.    Are you still keeping a log?

13    A.    Yes.  I just got back from a five-day

14  vacation and had twenty calls to log, about

15  fifteen of them telemarketing calls.

16    Q.    You said you are the only one that is

17  recording the log; is that right?

18    A.    Yeah, I'm the only one who writes on

19  the log sheets.

20    Q.    Are you the only one that answers the

21  telephone in your house?

22    A.    No.

23    Q.    What happens when your wife answers the

24  telephone for a telemarketer?

25    A.    She will generally choose not to answer

1  a call if she doesn't recognize the caller ID.

2    Q.    But you do answer the call when you

3  don't recognize the caller ID?

4    A.    Yes.

5    Q.    Why do you do that?

6    A.    Well, if you look -- see if I can find

7  an example here.  Look at page 22, call number 11

8  on that sheet.  March 13th at 3:14, I got a call

9  that the N that I did not answer.  The answering

10  machine picked it up.  There was no response.

11  Two hours later, on 3/13, I got a call from the

12  same caller ID, call number 13, again not

13  answered, no response.

14          I suspect that if we check a few days

15  later, I might have two or three more calls from

16  telemarketers from that same caller ID where the

17  call was not answered.

18          If I don't answer, they call back and I

19  have to wait and it rings and rings and rings

20  and -- so it's more efficient to answer and talk

21  to the caller than it is to have them call back

22  multiple times.  Costs him nothing to call me.

23    Q.    It's more efficient for you to get on

24  the phone and talk with a telemarketer for ten,

25  fifteen minutes than it is to delete a voice mail

1 from them?

2     A.   They won't stop calling unless I do.

3     Q.   You said it rings and rings and rings.

4 You have voice mail; right?

5     A.   Yes.  It rings four times.  And we had

6 a visitor.  My wife's sister was with us.  And

7 the call -- I think the call -- we had, like,

8 eight calls within six hours from the same caller

9 ID where she chose not to answer and -- it's

10 totally annoying.  I'm sorry.  That's why we're

11 here.  Personally, I would rather live my life

12 than answer telemarketing calls.

13     Q.   But you repeatedly answer telephone

14 calls from telemarketers; right?

15     A.   Yes.  I'm trying to do something about

16 it.

17     Q.   All right.  Let's look at page eight,

18 the first page here.

19     Yep.

20     Q.   Go down to entry number ten.

21     A.   Mm-hmm.

22     Q.   So this call you received on

23 December 23; is that right?

24     A.   Yes, the day before Christmas Eve.

25     Q.   Something -- is that -- what's your

1 indication for the time?

2     A.   Time is 18:00.  The reason for that is

3 that I was talking to my son in D.C., and I got a

4 call waiting signal.  So I discontinued my call

5 with him and picked up a telemarketing call, and

6 it was somebody asking if I wanted an insurance

7 quote.

8     Q.   Where did you get the company

9 information for Insure Me?

10     A.   If you listen to the recording, the

11 telemarketer indicated they were with Insure Me,

12 I believe.  The recording speaks for itself.

13     Q.   Why did you click over when you were on

14 the phone with your son?

15     A.   Because I had no idea who was trying to

16 get a hold of me.  I thought it might be

17 something important.  I guess it was.  We're here

18 today about that.

19     MR. BATSON:  Move to strike.

20 BY MR. REIF:

21     Q.   Above that there's an entry, number

22 nine.

23     A.   Yes.

24     Q.   16:09, a little after 4:00; is that

25 right?

1     A.   Mm-hmm.

2     Q.   And that company there you have listed

3 as Bankrate?

4     A.   Correct.

5     Q.   You had an ongoing dispute of sorts

6 with Bankrate, didn't you?

7     A.   Yes.

8     Q.   Can you tell me more about that?

9     A.   Yeah, I received a number of calls from

10 that caller ID.  One of those was a call that

11 referenced another insurance company, and it had

12 that same caller ID.

13     The Bankrate name was entered after the

14 fact -- after 6:23.  I could have entered that a

15 month later when I associated Bankrate with that

16 particular caller ID.

17     Q.   What about the entries in seven and

18 eight where you appear to have entered "Liberty"

19 and crossed it out?

20     A.   That I'm not sure of.  In both cases

21 there was no response on the answering machine.

22 I can't say specifically why that happened.  The

23 first time -- let's see.

24     I've got the Liberty.  Liberty was

25 mentioned in the 12/23 call.  I talked to a

1 Liberty agent, and that's why Liberty got into

2 that discussion cell, in that discussion section.

3     Q.   Right, but I'm talking about the other

4 calls; right?

5     A.   I'm -- I can only speculate that I was

6 guessing that the two calls from 12/22 and

7 12/23 with the same caller ID were related to the

8 call number ten.  Perhaps that happened because

9 it was a call waiting and I didn't have a caller

10 ID related to the 12/23 call.

11     Q.   Right.

12     A.   In other words, I didn't see a caller

13 ID on the 12/23 call.  So maybe the call -- maybe

14 the 12/22 and 12/23 calls were from the same

15 number.

16     Q.   But you --

17     A.   And then later when I received the

18 calls on, like, 2/18, at that point I could

19 identify that those were not Liberty Mutual

20 calls.  I had no identification on those calls.

21 I might have speculated those were Liberty calls.

22     Again, the purpose of the call log is

23 so that I can look back at the history and say

24 was that -- were those calls related.

25     So you could potentially find a Liberty

1 I was put in touch with -- I requested the lead
2 source. I believe that I was put in touch with
3 or directed toward Peter and then Peter called
4 back and left me a message on 12/30.
5    Q.   Does your recording system also record
6 your voice mail?
7    A.   Yes, it does.
8         (Marked Exhibit 3, Call Log Liberty
9          Mutual 2)
10   Q.   Handing you what we've marked
11 Exhibit 3.
12   A.   Thank you.
13   Q.   This is Bates labeled PLFF 1. Do you
14 recognize that document?
15   A.   I do.
16   Q.   Tell me what it is.
17   A.   It's a document that I produced to
18 summarize the telemarketer calls that I received
19 that were directly related to Liberty Mutual.
20   Q.   You drafted this document?
21   A.   Correct.
22   Q.   And are these just calls that you
23 received?
24   A.   Yes.
25   Q.   When did you make this document?

1    A.   Sometime after March 16.
2    Q.   Did you make it in 2015?
3    A.   I can't say.
4    Q.   Is it a document you still have on your
5 computer at home?
6    A.   Yes.
7    Q.   You could go back and check --
8    A.   Yes.
9    Q.   -- when you created it?
10   A.   Yes.
11   Q.   And --
12   A.   Interesting.
13   Q.   You said, "Interesting." What's
14 interesting about this?
15   A.   Can I say this was attorney-client
16 privileged? I provided this to Anthony as a
17 summary.
18        MR. McCUE: It's factual. I
19        appreciate you checking.
20 BY MR. REIF:
21   Q.   It's been produced in the case, so just
22 for the record put that out there. So through
23 that exchange, is it right to say that you
24 created this to help your attorneys --
25   A.   Yes.

1    Q.   -- assess the calls that you
2 received --
3    A.   Yes.
4    Q.   -- from Liberty Mutual?
5    A.   It's a summary of calls.
6    Q.   How does this compare to the
7 handwritten call log that we just looked at?
8    A.   I would expect it to be very similar.
9 I would hope the data is consistent. It includes
10 the duration of the call.
11   Q.   Where would you have received that
12 information?
13   A.   That's part of the recording.
14   Q.   So is it a fair assessment to say that
15 between the recording and the notes that you had
16 in your handwritten log, that provided the
17 content for this --
18   A.   Yes.
19   Q.   -- document?
20   A.   Yes. This was done -- this was done
21 after -- to provide a summary of what I
22 considered the facts of the case.
23   Q.   One of headings here is Confirmed
24 Interest in Auto Insurance Quote. Do you see
25 that?

1    A.   Yes.
2    Q.   What do you mean by that?
3    A.   If the telemarketer asked me if I am
4 interested in an auto insurance quote, I need to
5 continue the call, and the only way to continue
6 the call is to indicate an interest in his
7 product.
8    Q.   Why do you indicate an interest in the
9 call?
10   A.   I can't identify him unless I know who
11 he is. If he hangs up on me, I'm not going know
12 who he is.
13   Q.   You were on the call with the person
14 who actually had contacted you. Why weren't you
15 asking them who they were?
16   A.   That doesn't work.
17   Q.   What does that mean?
18   A.   They will hang up on me.
19   Q.   Based on what?
20   A.   Because they don't want me to trace
21 them. I think they know that they're making
22 illegal calls, and they don't want to be caught.
23        MR. BATSON: Move to strike.
24 BY MR. REIF:
25   Q.   So your solution is to continually, in

1    this case, confirm your interest in auto
2    insurance?
3        A.    Absolutely.
4        Q.    And you also -- it looks like every
5    time, except for what was listed as call two, you
6    agreed to be transferred to an insurance agent;
7    correct?
8        A.    Correct.  The reason I didn't end call
9    number two is I didn't get the option.
10        Q.    Can you explain that to me?
11        A.    I answered the phone call and nobody
12    answered.  Nobody responded.  There's a term, I
13    think they probably over dialed there.  That
14    would be my speculation.
15        Q.    When you picked up call two, there was
16    no one on the line?
17        A.    Correct.
18        Q.    How do you know that it was associated
19    with this case, or with Liberty Mutual?
20        A.    Because it's the same caller ID as a
21    call I received two hours later and received the
22    next day and the next day on two occasions.
23        Q.    Nothing on the --
24        A.    And the next day two days later.
25        Q.    We'll talk about some of them.  Nothing

1    actually on the call ever mentioned Liberty
2    Mutual?
3        A.    Yes.
4        Q.    Your only basis to say that this should
5    be part of this case is that there's a telephone
6    number that you saw as the same?
7        A.    The caller ID on that call and the five
8    following calls that resulted in a Liberty Mutual
9    contact is the same.
10        Q.    Before the listed calls that you have
11    listed out as one through seven --
12        A.    Yes.
13        Q.    -- there's a date at the top that's 20
14    June of 2014; correct?
15        A.    Mm-hmm.
16        Q.    Why is that entry on there?
17        A.    There's confusion about that.  At some
18    point I had a reference to a Liberty Mutual call
19    in June of 2014, but I haven't been able to track
20    that down.  Of course, I didn't have a good
21    recording system.  That was right about the time
22    I was starting my ring binder, spiral notebook
23    call log.
24              Somewhere in records I found a Liberty
25    Mutual reference to a November '14 call, but I

1    haven't been able to document that.
2        Q.    November '14 or June '14?
3        A.    I'm sorry, June '14.
4        Q.    I don't quite understand.  You found
5    reference to Liberty in your records, but you
6    haven't been able to document it.  What does that
7    mean?
8        A.    At some point in the case I thought I
9    had had a June 2014 call.
10        Q.    What does it mean, at some point in the
11    case?
12        A.    In putting the data together, there was
13    an indication that there was a June 2014 call.  I
14    haven't been -- I can't find that reference
15    again.
16        Q.    I'm just confused about what prompted
17    you to think there was that contact in the first
18    place.
19        A.    There was -- I had a cryptic note from
20    June 2014.  I don't have it now.  I can't find
21    it.  I don't know what it was.  I thought there
22    had been a contact in June of 2014 with Liberty
23    Mutual, didn't -- on further check, I couldn't
24    confirm it and so it wasn't relevant to the, to
25    the calls that I could confirm that were actually

1    with Liberty Mutual.
2              Again, my documentation in June of 2014
3    was not as good as it was by January 2015.  If
4    you told me I had contact with Liberty Mutual in
5    2014 through a telemarketer, I would say, yeah,
6    that very likely could have happened because my
7    documentation isn't good enough to say what's
8    there.
9        Q.    It's also possible that you didn't have
10    contact with Liberty in June 2014?
11        A.    Correct.
12              (Marked Exhibit 4, Call Sheet
13              Liberty Mutual Summary)
14        Q.    Do you recognize Exhibit 4?
15        A.    Yes.
16        Q.    Tell me what it is.
17        A.    Oh, there are two pages.
18        Q.    Two pages?
19        A.    Yes.
20        Q.    Can you tell me what the first page is?
21        A.    First page is a summary of the seven
22    calls, the seven telemarketing calls, from
23    Liberty Mutual, plus the eighth call, which was a
24    call -- which was an outgoing call back to
25    Liberty Mutual about the March 16 call.

1    Q.   This doesn't list the December call
2  that you're alleging; correct?
3    A.   Correct.
4    Q.   Do you know why you have this document
5  in addition to the one that we looked at as
6  Exhibit 3?
7    A.   It's repetitious.
8    Q.   Doesn't contain all of the same
9  information though, does it?
10    A.   Yes.
11    Q.   Did you create this document?
12    A.   Yes.
13    Q.   Why did you do that?
14    A.   It's on an Excel spreadsheet.
15    Q.   Why did you make it?
16    A.   Again, it was a summary.  I'm not sure
17  specifically why.
18    Q.   For your attorneys?
19    A.   That's a possibility.
20    Q.   When did you make this document?
21    A.   I don't know the date.
22    Q.   Could this also still be on your home
23  computer?
24    A.   Correct.  It should be.  It's possible
25  that, too, that I overwrote one of them with the

1  other, although I'm not sure.
2    Q.   Where did you get the information that
3  you used to populate this spreadsheet?
4    A.   Probably from -- the two were, were
5  similar.  I mean, they're basically the same
6  information with a few minor exceptions.
7    Q.   Let's look at the next page.
8    A.   The Exhibit 3 contains the name of the
9  agent and the agreement to transfer to the agent.
10  Exhibit 4 does not.
11    Q.   All right.
12    A.   Again, it's a summary of the data that
13  I had on the case.
14    Q.   And the second page here?
15    A.   Yes.
16    Q.   So at the bottom of these two pages,
17  there's Liberty Mutual 1 and 2.  Are these part
18  of the same spreadsheet?
19    A.   Probably.  It's possible that they're
20  the same file, or they might be two separate
21  sheets.  That could be an Excel sheet name rather
22  than a file name.  Probably is.
23    Q.   On page Bates labeled 3, what kind of
24  calls have you listed here?
25    A.   That's a detail of the communication

1  between me and Liberty Mutual after the, after
2  the December 23rd call.
3        This was prepared for the attorneys so
4  that I could explain what the contacts were,
5  summarize what the contacts were and what the
6  recordings are.  I shared all the recording data
7  with the, with my attorney.
8    Q.   Are the calls on page two, looks like
9  they're a combination of inbound and outbound
10  calls?
11    A.   Correct.
12    Q.   On page two, is it right that these are
13  just calls from 2014?
14    A.   Correct.  These are 2014 calls.
15    Q.   The first page we looked at, those are
16  all 2015 calls?
17    A.   Yes.
18    Q.   But these don't list the May calls that
19  you made to Liberty; correct?
20    A.   Correct.
21    Q.   Do you know why those calls aren't on
22  here?
23    A.   No.  It's a summary sheet that was
24  appropriate at the time.
25    Q.   What does that mean?

1    A.   When I made it and exactly why I made
2  it, I can't say at this point, but I did it to
3  communicate all the contact information I had.
4        MR. REIF:  Let's take another quick
5  break.
6        (Recess taken)
7  BY MR. REIF:
8    Q.   We're going to get into the call
9  recordings here in a minute.  Before we do, let's
10  talk about the XRT device.
11    A.   Correct.
12    Q.   Is this a physical machine that's next
13  to your phone and plugs into it?  How does that
14  work?
15    A.   Exactly.  It's a small box about five
16  inches by three inches by two inches with a wire
17  that goes to the phone and goes to the phone
18  line.
19    Q.   Do you have it on every phone in your
20  house or just one phone?
21    A.   It's on the one phone line.  It picks
22  up every call.
23    Q.   So every call that your land line gets
24  picked up by this device; correct?
25    A.   Correct.

1  number.  Do you see that?
2  A.  Yes.
3  Q.  And you go on to tell them, I can tell
4  you exactly how they got it; right?
5  A.  Okay.
6  Q.  Right?
7  A.  That's what I stated.
8  Q.  And then Brendan says that they
9  transferred the call to you; right?
10  A.  Correct.
11  Q.  Or to him, rather, sorry.  And then you
12  chime in.  You say that you received a call at
13  4:09 that day from a company that you thought
14  represents Bankrate Insurance; correct?
15  A.  Correct.
16  Q.  Yes?
17  A.  Correct.
18  Q.  And you go on to say that they asked if
19  you were interested in auto insurance quotes;
20  right?
21  A.  Yes.
22  Q.  You say that you have received a lot of
23  calls from that group.  You said you were
24  interested.
25  A.  Correct.

1  Q.  So you understood that you were making
2  an association between requesting an auto
3  insurance quote and that call you received two
4  hours later; right?
5  A.  Yes.
6  Q.  When I asked you earlier whether you
7  ever requested an auto insurance quote and you
8  said no, that wasn't correct, was it?
9  A.  Correct.
10  Q.  So we can go back to the front here,
11  page one.
12  A.  Yes.
13  Q.  So after you discussed requesting a
14  quote, you move on and she asked if you have some
15  time to go over a quote with an agent; right?
16  A.  Yes.
17  Q.  And you said you did?
18  A.  Yes.
19  Q.  Again, you could have said that you
20  were busy or that you didn't want that call, but
21  you didn't; right?
22  A.  Correct.
23  Q.  If you move to page two, after a few
24  initial questions with a person from Insurance
25  Solutions, they ask about transferring to you a

1  licensed representative; correct?
2  A.  Correct.
3  Q.  And you agreed to be transferred;
4  right?
5  A.  Correct.
6  Q.  Again, why did you agree to be
7  transferred?
8  A.  So I could identify who was making the
9  call.
10  Q.  We've talked about this a little bit
11  already, but I want to be clear.  You were on the
12  phone with the person that called you; right?
13  A.  Correct.
14  Q.  You never asked them why they called
15  you, did you?
16  A.  Correct.
17  Q.  And you didn't ever ask them or tell
18  them that you weren't interested in insurance;
19  right?
20  A.  Correct.
21  Q.  Did you ever ask them to be put on
22  their do-not-call list?
23  A.  No.
24  Q.  Why?
25  A.  Because at that point I did not know

1  who they were, and experiences indicated that if
2  I failed to indicate an interest or if I indicate
3  any interest in identifying who they are, they
4  will disconnect.  I don't know they will do that,
5  but experience has shown that they will do that.
6  Q.  There's a difference between knowing
7  who someone is and requesting to be on their
8  do-not-call list, isn't there?
9  A.  Yes, yes.
10  Q.  Why didn't you at least ask to be on
11  their do-not-call list?
12  A.  Because I've done that before.  I've
13  done that with other telemarketers.  If I ask who
14  they are, if I ask will they put me on their
15  do-not-call list, they will disconnect and they
16  will very probably call me again in the next day,
17  week, month.
18  Q.  But you can't say that's the case --
19  A.  But I don't know that this one would.
20  Q.  You never made that request --
21  A.  Because I didn't do it.
22  Q.  Please wait for me.  You don't know
23  that because you never made the request to the
24  representative from Insurance Solutions; correct?
25  A.  Correct.

1     Q.    After you told her that you were
2  interested in an auto insurance quote and that
3  you were okay with being transferred to a
4  representative, who did you speak with?
5     A.    That would have been Brendan.
6     Q.    And again, as part of the transferring
7  process, the representative from Insurance
8  Solutions mentioned that you were looking for
9  auto insurance, and you didn't object that point
10 and say that you weren't, did you?
11    A.    Correct.
12    Q.    So you -- move to page three.  You
13 continue a conversation with Brendan about auto
14 insurance; correct?
15    A.    Correct.
16    Q.    And he goes through and confirms some
17 information about you; is that right?
18    A.    Correct.  He confirmed the information
19 that he was provided by the telemarketer.  I
20 expect that's the case.  I don't know that, but I
21 suspect it.
22    Q.    Some of the information, he starts by
23 asking for your name including your last name;
24 right?
25    A.    Yes.

1     Q.    Then he moves on to ask about your
2  address; right?
3     A.    Correct.
4     Q.    And he asked about your Turin Hill --
5     A.    Correct.
6     Q.    -- address, and you said that you live
7  there; right?
8     A.    Yes.
9     Q.    You didn't live there at that point,
10 did you?
11    A.    Correct.
12    Q.    Had you lived at the Turin Hill address
13 for about twenty years?
14    A.    Correct.  I'm sorry, I lived at the
15 Turin Hill address from roughly 1990 until 2013.
16    Q.    Is there a reason --
17          MR. BATSON:  Sorry, what was the
18     last date?
19          THE WITNESS:  Until 2013.
20          MR. BATSON:  Thank you.
21 BY MR. REIF:
22    Q.    Is there a reason that you didn't
23 correct Brendan when he asked you where you
24 lived?
25    A.    I didn't see purpose to correct that.

1     Q.    He did have your proper contact number;
2  correct?
3     A.    Yes.
4     Q.    That's your (614)791-1037 land line; is
5  that right?
6     A.    Correct.
7     Q.    Move to page four.  You ask for some
8  information about Brendan; right?
9     A.    Yes.
10    Q.    Why did you do that?
11    A.    So I could take who he was and let him
12 know that I had valid information for him.
13    Q.    On here you say, Hold on, I'm grabbing
14 paper and turning on the lights; right?
15    A.    Yes.
16    Q.    Were you actually doing that?
17    A.    Just a second.  Let me make sure on
18 that one.  Okay.  Brendan asked me if he had my
19 contact number.  I confirmed that he did.  Since
20 he started the information exchange that way, I
21 figured it's now an appropriate time for me to
22 identify who he is.  That's what I proceeded to
23 do.  Yes, I probably was grabbing paper and
24 turning on the lights.
25    Q.    Why would you need paper if you knew

1  the call was being recorded anyway?
2     A.    I found that it's -- occasionally I
3  need to have the information available, the
4  contact information available, while I'm on the
5  phone with the telemarketer.  In other words, I
6  don't know where this conversation is going, but
7  I felt that at this point the telemarketer is
8  willing to give me his information because at
9  this point he has a customer that he has a
10 potential client that will possibly buy from him.
11    Q.    Okay.  You've repeated that we've
12 referred to this person as a telemarketer;
13 correct?
14    A.    Correct.
15    Q.    Brendan didn't actually call you, did
16 he?
17    A.    I believe a telemarketer is defined as
18 anybody who sells a product or service over the
19 telephone.
20    Q.    You're referring to that based on your
21 understanding of --
22    A.    The TCPA law, that's my understanding.
23    Q.    You don't think that a telemarketer
24 needs to initiate the call at all?
25          MR. McCUE:  Objection.

1    A.   No.  I believe he can be vicariously
2  liable.
3    Q.   I'm not asking you for a legal
4  interpretation of it.  I'm asking if you see the
5  person providing you with information insurance
6  that you've requested as a telemarketer?
7    A.   Yes.  If someone is selling me
8  something over the phone, I consider them a
9  telemarketer.
10    Q.   Let's go back quickly.  When you were
11  transferred or before you were transferred to
12  Brendan --
13    A.   Mm-hmm.
14    Q.   -- from the representative of Insurance
15  Solutions, did she tell you that she was
16  transferring you to an insurance agent?
17          MR. McCUE:  Give him a page number.
18 BY MR. REIF:
19    Q.   Yeah, maybe in page two.  I think
20  that's when the transfer takes place.
21    A.   All right.  Let me go ahead and -- Luca
22  is saying, All right.  Let me go ahead and
23  transfer you to our licensed -- to our licensed
24  representative.  I will be staying on the line to
25  introduce you to the licensed agent.  Please note

1  this call may be monitored for quality purposes.
2  Okay.  And I state, Okay.
3    Q.   Right.  She told you she was
4  transferring you to a licensed agent; correct?
5    A.   And I said, Okay.  Her licensed agent,
6  by the way.
7    Q.   Well, she said "our" the first time.
8  She said "the" the second time; right?
9    A.   Correct.
10    Q.   Did she -- she never identified which
11  insurance company you were going to be connected
12  to, did she?
13    A.   That is correct.
14    Q.   Did you ever ask --
15    A.   No.
16    Q.   -- who you were going to be talking to?
17    A.   Record doesn't show that.
18    Q.   Did you find out later, or you did find
19  out later who Brendan was associated with;
20  correct?
21    A.   Correct.
22    Q.   Let's move ahead to four then.  So you
23  asked -- then you decided that there was
24  information exchanged so you could --
25    A.   At this point --

1    Q.   You need to wait for me, please.  I'm
2  trying to make everyone's life easier.
3         You said there was an information
4  exchange, and you asked about information from
5  him?
6    A.   Correct.
7    Q.   Okay.  So he gave you his first and
8  last name; right?
9    A.   Yes.
10    Q.   Then you asked who he represented;
11  right?
12    A.   Correct.
13    Q.   And he told you that he was with
14  Insured Street; right?
15    A.   Yes.
16    Q.   Okay.  Then he went on to tell you that
17  he represents other companies; correct?
18    A.   Correct.
19    Q.   So Liberty Mutual is one; right?
20    A.   Yes.
21    Q.   But also The General; right?
22    A.   Yes.
23    Q.   And Esurance, 21st Century, Titan?
24    A.   Yes.
25    Q.   Have you ever reached out to any of

1  those other companies as part of your concern
2  over TCPA calls?
3    A.   No.
4    Q.   Why moving on to page five, why did you
5  ask where he was located?
6    A.   Because I need to be able to contact
7  him and identify who he is in order to proceed
8  with the claim against him.
9    Q.   So at this point you were already
10  thinking about claims against this person?
11    A.   I was thinking about claims against
12  this person when the phone rang.
13    Q.   You approach every incoming call that
14  you receive that way?
15    A.   That starts with telemarketing scheme,
16  yes.
17          MR. BATSON:  Move to strike.
18 BY MR. REIF:
19    Q.   How do you know what a telemarketing
20  scheme is, in your words?
21    A.   Well, I knew for sure after the second
22  statement Luca made.  Hi, this is Luca from
23  Insurance Solutions.  I suspected -- I would have
24  suspected it if I had observed her caller ID when
25  I picked up the phone, but in this case I didn't

1    received two calls, but we'll get there.
2        A.    Yep, okay.
3        Q.    So this call starts with a caller named
4    David; right, calling again from the quality
5    assurance department of Auto Insurance Services;
6    correct?
7        A.    Correct.
8        Q.    This was the second call that you had
9    received in two days from someone from Auto
10   Insurance Services; right?
11       A.    I believe that's the same caller, yeah,
12   Auto Insurance Services, correct.
13       Q.    Okay.  And the David here asks you a
14   series of questions including if you're
15   interested in a free quote?
16       A.    Correct.
17       Q.    And you said, Sounds like a good idea;
18   right?
19       A.    Yes.
20       Q.    You weren't interested in insurance at
21   that time, were you?
22       A.    Yes.
23       Q.    But you said yes so that you could stay
24   on the line?
25       A.    Correct.

1        Q.    Did you ever ask to be put on David's
2    do-not-call list?
3        A.    Nope.
4        Q.    At one point David says that he's going
5    to get you over to an insurance agent who will
6    give you your free quote; right?  This is on page
7    two.
8        A.    Yep, confident we'll be able to save
9    you some money here is what he says.
10       Q.    At the start of that paragraph, he
11   says, Let me get you over to an insurance agent?
12       A.    Yes.
13       Q.    Correct?
14       A.    Correct.
15       Q.    And you again said, Okay?
16       A.    Correct.
17       Q.    And David never told you who he was
18   transferring you to before he made the transfer,
19   did he?
20       A.    The record shows that.
21       Q.    Record shows he didn't?
22       A.    Correct.
23       Q.    And you didn't ask him?
24       A.    Correct.
25       Q.    He ultimately transferred you to a

1    person named Mingo Rubio; correct?
2        A.    Yes.
3        Q.    And he says that he's got some
4    information that he is going to pull up on you;
5    correct?
6        A.    Yes.
7        Q.    So starting on page two, he notes that
8    your current address is the Turin Hill address;
9    right?
10       A.    Correct.
11       Q.    Yes?
12       A.    Yes.
13       Q.    And we've been over this.  You said
14   that it was even though it wasn't at that point?
15       A.    Correct.
16       Q.    He also shows that your current
17   insurance is with Cincinnati; right?
18       A.    Correct.
19       Q.    Do you have any idea how he knows that?
20       A.    No way.
21       Q.    You hadn't --
22       A.    No, I -- I have no idea how he knew
23   that.
24       Q.    And he goes on to show you a -- he asks
25   you, rather, if you were renting at your

1    location?
2        A.    Yes.
3        Q.    And you said that you owned?
4        A.    Yes.
5        Q.    He then goes through on page three to
6    ask you questions about the other driver who you
7    identified as your wife, Rita; correct?
8        A.    Correct.
9        Q.    And you give a birth date for her;
10   right?
11       A.    Yes.
12       Q.    It's not her actual birth date, is it?
13       A.    Correct.
14       Q.    Is there a reason that you gave a
15   different one?
16       A.    Didn't want to share personal
17   information --
18       Q.    Okay.
19       A.    -- with a person that I don't know.
20       Q.    Same with yours, too.  It's not your
21   birthday, is it?
22       A.    Correct.  Wait a minute, my -- he asked
23   my date of birth.  I gave him the 15th, year '52.
24   He asked Rita's date of birth.  I gave him
25   January 20, '52, again just because I didn't want

1  to share the personal information with an unknown
2  person.

3     Q.  And you said that college was the
4  highest level of education you completed.  That's
5  on page four.  Right?

6     A.  Correct.

7     Q.  But you told me that you've got several
8  master's degrees; right?

9     A.  I would -- correct.

10     Q.  He asked if you're working or retired
11  and you said working; right?

12     A.  Yes.

13     Q.  And you were retired at that point,
14  weren't you?

15     A.  Correct.

16     Q.  He asks about what kind of cars you
17  have; right?

18     A.  Down below, yes.

19     Q.  And you said a 2006 Honda Accord;
20  right?

21     A.  Correct.

22     Q.  Was that true?

23     A.  No.

24     Q.  What kind of car did you have at that
25  time?

1     A.  2005 Accord.

2     Q.  And he asked if you had any other cars
3  and you said no; right?

4     A.  Correct.

5     Q.  But Rita had her own car at that point,
6  too?

7     A.  Correct.

8     Q.  That was the Odyssey?

9     A.  Yes.

10     Q.  So you go through this whole process,
11  and on page five, he's actually able to give you
12  an auto insurance quote; correct?

13     A.  Yes.

14     Q.  Now, again, you didn't have interest in
15  an auto insurance quote from Mingo, did you?

16     A.  Yes.

17     Q.  Why did you go through all of that
18  information, very little of which was true, in
19  order to ultimately ask him a series of questions
20  about who sent the call?

21     A.  Because I have to be a legitimate
22  customer to keep him on the line.

23     Q.  You know that based on what?

24     A.  He'll disconnect.  I suspect he'll
25  disconnect if I become a non-prospect because he

1  has no value in staying on the line with me after
2  that.

3     Q.  But you don't know that based on --

4     A.  That's what I expect.  That's expected
5  behavior.

6     Q.  So in the next couple of pages, you ask
7  again about Mr. Rubio's name and his contact
8  information; is that right, on page five and six?

9     A.  I can't track the call unless I can
10  identify the caller.

11     Q.  On page seven, you start asking about
12  where he got the lead; correct?

13     A.  Correct.

14     Q.  And he tells you that you were
15  transferred to him and that usually the lead
16  would come in if you filled out something online;
17  right?

18     A.  Correct.

19     Q.  And he asks you, in fact, if you at any
20  point filled out an online quote, right, or
21  filled out -- requested an online quote; right?

22     A.  Where is that?

23     Q.  It's about halfway down.  He says, At
24  any point in time did you fill out, like, an
25  online quote?

1     A.  Yes.

2     Q.  And you said no?

3     A.  Right.

4     Q.  So on page eight, again, middle of the
5  page --

6     A.  Okay.

7     Q.  -- you say to Mingo that the gentleman
8  that generated the lead violated the do-not-call
9  list by calling you; right?

10     A.  That's where?  Yes, okay.

11     Q.  And you said that you want to track him
12  down; right?

13     A.  Yes.

14     Q.  Again, you never asked the person who
15  called you initially where he got your
16  information, did you?

17     A.  Correct.

18     Q.  Correct?

19     A.  Correct.

20     Q.  Go to page nine.  Toward the bottom a
21  sentence that starts with "okay."  You say, Can
22  you explain why I got your call then.  Mingo
23  says, I can't.  I didn't call you myself, you
24  know, so it has to be the lead source that did
25  it.  Right.  Do you see that?

1    Q.    What kind of calls was National
2 Guardian Life making to you?
3    A.    My recollection is that they were
4 burial insurance calls.
5    Q.    Burial insurance?
6    A.    Yes.
7    Q.    Uplifting kind of call.
8    A.    Yeah, socially -- never mind --
9 socially suspect, okay.
10    Q.    And that case was filed in January of
11 2015?
12    A.    Whatever the record says.
13    Q.    How did you come to be associated with
14 that case?
15    A.    I met Anthony and provided him with the
16 call evidence that I had and asked if it was
17 appropriate for a class action case.
18    Q.    You said that that case is in the
19 process of settlement now?
20    A.    Correct.
21    Q.    As part of that settlement, you're in
22 line to get $10,000 as one of the named
23 plaintiffs in that case, aren't you?
24    A.    Correct.
25    Q.    You've also got a case against Home

1 Advisor, Inc.?
2    A.    Correct.
3    Q.    And that's in Ohio; is that right?
4    A.    If that's what the record says, I think
5 that's correct.
6    Q.    I see it here as the Southern District
7 of Ohio, Columbus.  And that case was filed in
8 February of this year?
9    A.    If that's what the record says.
10    Q.    I see that Mr. Paronich is one of your
11 counsel for that case?
12    A.    Correct.
13    Q.    What was your -- what are your
14 allegations in that case?
15    A.    I was called by a telemarketer who was
16 related to Home Advisor.
17    Q.    Who's Home Advisor?
18    A.    They do home -- they supply leads to
19 contractors for home remodeling projects.
20    Q.    It's your position in this case that
21 you didn't consent to be called by them?
22    A.    Correct.  I'm on the National
23 Do-Not-Call list.  I certainly didn't provide
24 written consent to make telephone calls.
25    Q.    Same in your National Guardian Life

1 case, it was your position that you hadn't
2 consented to be contacted by them?
3    A.    Correct, and they had no evidence to
4 support that.
5        MR. McCUE:  Mike, before you move
6    on, just for the record, when I prepped
7    Mr. Johansen last night, we realized
8    there was a mistake on the
9    interrogatory.  There was a third class
10    action.  I can tell you about it now.
11        MR. REIF:  I was going to ask about
12    it.
13    Q.    The third case I was going to ask
14 about, and your counsel has previewed part of my
15 concern, is that we have an interrogatory --
16 nineteen, I think -- that asks for your
17 involvement in certain cases.  You had limited it
18 to these two, but we in our research found a
19 third case.
20    A.    We discovered that last night that
21 there's an error on the interrogatory response.
22    Q.    That case is Johansen verse GVN
23 Michigan, Inc.?
24    A.    Correct.
25    Q.    This is your case before Judge Posner,

1 and this is in the Northern District of Illinois;
2 is that right?
3    A.    I believe that is correct.
4    Q.    Also filed in January of 2015?
5    A.    If that's what the record states.
6    Q.    What are the allegations -- your
7 allegations against GVN Michigan in that case?
8    A.    Illegal telemarketing calls with no
9 consent.
10    Q.    What is GVN Michigan's business?
11    A.    Global Vacation Network is what the
12 acronym is.  They sell sort of a timeshare
13 system.
14    Q.    Your position is that you hadn't
15 consented to being contacted by them?
16    A.    Correct.
17    Q.    Do you have class certification granted
18 in any of the three cases that we're talking
19 about?
20    A.    Class meaning?
21    Q.    Was it actually certified?
22    A.    In the National Guardian Life there's
23 class certified.  I don't know what the status is
24 on the other cases.
25    Q.    Were you deposed in any of these cases?

1    Q.   -- with Bankrate?

2    A.   Correct.

3    Q.   Do you know which calls that that

4  settlement agreement pertained to?

5    A.   Not off the top of my head.

6    Q.   Do you recall whether it was associated

7  in any way with the December 23 call, 4:09 call?

8    A.   I can't state that.  I don't know that

9  answer.

10    Q.   I apologize, the numbering on these is

11  a little tough.  If you move on the top right, it

12  says, "Page 3 of 4."

13    A.   Yes.

14    Q.   There's an entry, 12/19/14, it says --

15  there are two entries.  The top one says,

16  "Amended complaint filed."  Do you see that?

17    A.   At the top of the page three?

18    Q.   It's closer to the middle of the page

19  three.

20    A.   Yeah, okay.

21    Q.   Did you file an amended complaint?

22    A.   I did.

23    Q.   What did you change between your

24  initial complaint and this one?

25    A.   Pretty much I rewrote the complaint.

1  The defendant moved that -- hum.  I think he

2  moved to dismiss because I failed to file a

3  claim, filed to file a claim.  That's my

4  recollection.

5    Q.   I don't see a motion to dismiss on

6  here, but regardless, there was something that

7  prompted you to change your complaint?  That's

8  what happened here?

9    A.   Correct.

10    Q.   Move on to the next docket.  If you

11  move past page four of four, the next one I have

12  here is you versus Royal Bahama Cruise Line.

13    A.   Yes.

14    Q.   What was this case about?

15    A.   Telemarketing calls.

16    Q.   What did Royal Bahama call you about?

17    A.   Cruise vacations.

18    Q.   In Case Disposition, it says,

19  "Voluntary dismissal."  Do you see that?

20    A.   Yes.

21    Q.   February 2015.

22    A.   Correct.

23    Q.   Why was the case dismissed?

24    A.   I believe we settled that one.

25    Q.   Are the terms of that settlement

1  confidential?

2    A.   I would expect so, but I'm not certain.

3    Q.   Let's move on to the next one.  This is

4  a case that you brought against Home Advisor.

5    A.   Correct.

6    Q.   What was this case about?

7    A.   Illegal telemarketing calls.

8    Q.   What was Home Advisor calling you

9  about?

10    A.   About home improvement projects.

11    Q.   So you actually brought suit against

12  Home Advisor in federal court; right?

13    A.   Correct.  They didn't stop after we

14  settled.

15    Q.   In this one, the case was dismissed in

16  March of '15; right?  In Case Disposition, that's

17  what it says.

18    A.   March 6th.

19    Q.   On page one of three it says, for case

20  deposition, "Case dismissed."

21    A.   March 6th.

22    Q.   On page two of three, it looks like

23  that defendant filed a motion to dismiss this

24  case; right?

25    A.   I believe we settled that one.

1    Q.   This says on February 6th, 2015, it

2  says, "Defendant's motion to dismiss filed."

3    A.   December 6.

4    Q.   February 6.

5    A.   February 6.  Oh, I'm sorry, okay.  This

6  is the -- I'm pretty sure we settled this one.

7    Q.   A month after the motion to dismiss

8  filing, you'll notice that the case is dismissed.

9  Do you see that?

10    A.   Hum, yep.

11    Q.   Do you recall whether that was -- it

12  was dismissed based on defendant's motion or was

13  it dismissed because you settled it?

14    A.   Home Advisor, the case was filed on

15  12/31.  My recollection is we had a settlement on

16  that one, but I can't state for certain.

17    Q.   I've been working off page two.  I was

18  trying to get a sense for that.

19    A.   Yeah.

20    Q.   Okay.  Move on to the next entry.  This

21  is your case against Madison and Company.

22    A.   Yes.

23    Q.   And this one, it says that -- under

24  Case Deposition, on page one, it says that there

25  was judgment for you; right?

1    A.    Correct.

2    Q.    What was this case about?

3    A.    That was Card Member Services phone
4    calls.

5    Q.    If you move to page two, it says that
6    judgment was for you in the sum of $500; right?

7    A.    Correct.

8    Q.    So was that a statutory amount for one
9    call --

10    A.    Yes.

11    Q.    -- under the TCPA?

12    A.    Correct.

13    Q.    The next case is your case versus Grand
14    Bahama Cruise Lines.

15    A.    Mm-hmm.

16    Q.    Again, the disposition here was
17    judgment for you; is that right?

18    A.    Judgment for plaintiff, yes.

19    Q.    Just a couple months ago?

20    A.    Yep.

21    Q.    If you move to page two, it said that
22    you were awarded $1,500 for that?

23    A.    Correct.

24    Q.    And these were also TCPA claims
25    regarding calls?

1    A.    Correct, yep.

2    Q.    Move on to the next one.

3    A.    Yes.

4    Q.    This is your case against Fortune
5    Residences and Yacht Club?

6    A.    Correct.

7    Q.    You also got a win in this case; right?

8    A.    Correct.

9    Q.    And on page two, we see that you were
10    awarded $2,000 there?

11    A.    Correct.

12    Q.    Is it your recollection that you would
13    have received four calls from them?

14    A.    Actually I think it was -- it was an
15    unusual judgment.  I think it was, I was -- not
16    triple damages but double damages on two calls.
17    The judge decided that they weren't totally --

18    Q.    In these cases when there was judgment
19    for you, was that after a hearing took place in
20    which you were presenting evidence to the judge?

21    A.    Yes.

22    Q.    Let's move on to the next one.  This is
23    your case against Golden Ticket Getaways.

24    A.    Correct.

25    Q.    You also got judgment in this case, and

1    on page two, it says for $1,500; right?

2    A.    Correct.

3    Q.    What was Golden Ticket calling you
4    about?

5    A.    Vacation packages, timeshares.

6    Q.    This was a case you filed in January of
7    2016; right?

8    A.    Correct.

9    Q.    It was the same day that you filed a
10    case against Spinnaker Resorts; right?

11    A.    Correct.

12    Q.    You were awarded $1,500 in that case?

13    A.    Yes.

14    Q.    What was Spinnaker doing?

15    A.    Spinnaker was timeshares.

16    Q.    Making calls to you that you hadn't
17    consented to?

18    A.    Correct.

19    Q.    The next one you filed in March of this
20    year against Getaways Marketing Corp.?

21    A.    Correct.

22    Q.    And just a few weeks ago were awarded
23    $2,000?

24    A.    Correct.

25    Q.    And what was Getaways doing?

1    A.    They were timeshares and cruise
2    vacation packages.  Actually, it was vacation
3    packages they were selling.

4    Q.    In this one --

5    A.    Free cruise.

6    Q.    In this one you also sued a Harry
7    Montalvo --

8    A.    Yes.

9    Q.    -- who ended up getting dismissed from
10    the case?

11    A.    Yes.

12    Q.    What was his involvement?

13    A.    I believe he was the corporate agent
14    for Getaways.

15    Q.    Why did you sue him individually?

16    A.    Because I thought I would have a better
17    chance of getting paid.

18    Q.    Do you remember why he was dismissed?

19    A.    Because I couldn't show that he was
20    legally responsible for the calls.

21    Q.    And you were awarded judgment after
22    some sort of trial proceeding in this?

23    A.    Correct.

24    Q.    What is the process -- understanding
25    that judges may do things differently, but what's

1 multiple times -- multiple, multiple times, like
2 thirty telemarketing calls, all with the same
3 prerecorded message. I filed a common pleas case
4 against them. They filed a dismissal notice. I
5 discovered that I was legally in over my head.
6 So I talked with an attorney and voluntarily
7 dismissed the case. It's being retired.
8     Q.    This is your LifeWatch case?
9     A.    Yes.
10    Q.    So what I am seeing here is a small
11 claims hearing. So it looks like you initially
12 filed this --
13    A.    Oh, wait a minute. Wait a minute. I'm
14 sorry, I had that wrong. Yeah, that was -- this
15 one was settled.
16    Q.    Okay.
17    A.    This one was settled and then there was
18 a second LifeWatch case that was voluntarily
19 dismissed.
20    Q.    Okay. Is that second one that is being
21 part of an additional lawsuit right now?
22    A.    The second one is, yeah, second one is
23 an additional lawsuit. This one, the one from
24 2014, was settled. There should be a second
25 LifeWatch case that will -- that was filed,

1 voluntarily dismissed with the option of
2 refiling, and that one is being refiled.
3     Q.    The last case I'm showing here is a
4 case against Home Advisor again.
5     A.    Yes.
6     Q.    This was from September of 2014?
7     A.    That was the initial Home Advisor case.
8     Q.    Okay. Was that the first small claims
9 case that you filed?
10    A.    Yes.
11    Q.    Kind of got a taste for this. You got
12 judgment in that case, too; right?
13    A.    Yes.
14    Q.    Two thousand dollars, okay.
15    A.    As the records show.
16    Q.    Moving back to our case, have you -- do
17 you have a sense for how much you view this case
18 is worth to you?
19        MR. McCUE:  Objection, instruct the
20    witness not to answer that question. No
21    way. Move on.
22        MR. REIF:  Okay.
23    Q.    I'm not asking about what your
24 attorneys have told you. I'm wondering about how
25 you view how you've been damaged and putting a

1 number on that.
2     A.    My privacy has been invaded. I've got
3 a home and that phone rings because the
4 defendants call me.
5     Q.    We've established all day today that
6 Liberty Mutual didn't make any of the calls that
7 you received; right?
8     A.    I believe that they are liable for the
9 calls.
10    Q.    But the evidence shows that other
11 parties were actually placing those calls to you,
12 doesn't it?
13    A.    Somebody is going to have to decide
14 what the evidence shows.
15    Q.    Are you aware of Liberty Mutual's offer
16 of judgment to you in this case?
17    A.    No. I don't think so. If you tell me
18 it's not true, I don't think I've got an offer of
19 judgment.
20    Q.    So you don't recall considering any
21 offer of judgment made to you by Liberty Mutual?
22    A.    I don't think, and if I had, I would
23 have denied it.
24    Q.    Why would you have denied it?
25    A.    Because I have a fiduciary

1 responsibility to the class members.
2     Q.    Are you aware that Digitas has placed
3 an amount in escrow for you in this case?
4     A.    No.
5     Q.    You've never heard that they've put
6 over $11,000 in an account for you?
7     A.    I don't think so, but -- boy, if you
8 have information that it has, I can't say for
9 sure, but --
10    Q.    Okay. So you --
11    A.    I have rejected settlement offers, so
12 that's why I'm reluctant to state for sure.
13        MR. McCUE:  Let me clarify. You're
14    using the term "offer of judgment," and
15    it might be causing some confusion here.
16    If you want to clarify or I can clarify.
17 BY MR. REIF:
18    Q.    I'm talking about a different thing
19 now. I'm done talking about the offer of
20 judgment. This is from pre --
21        Digitas placed an amount in escrow
22 associated with satisfying your claims in this
23 case. I'm wondering if you have an awareness of
24 that?
25    A.    It's possible that I do. I don't have