| | |
|---|---|
| KEN JOHANSEN, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>       v.<br><br>LIBERTY MUTUAL GROUP, INC.; and SPANISH QUOTES, INC. d/b/a WESPEAKINSURANCE,<br><br>       Defendants,<br>LIBERTY MUTUAL GROUP, INC.,<br><br>       Crossclaimant,<br><br>       v.<br><br>SPANISH QUOTES, INC. d/b/a WESPEAKINSURANCE,<br><br>       Crossdefendant,<br>LIBERTY MUTUAL GROUP, INC., LIBERTY MUTUAL INSURANCE COMPANY,<br><br>       Third-party Plaintiffs,<br><br>       v.<br><br>PRECISE LEADS, INC., and DIGITAS, INC.,<br><br>       Third-party Defendants | Civil Action No. 1:15-cv-12920-ADB |

**<u>STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PURSUANT TO LOCAL RULE 56.1</u>**

Cross-Claimant and Third Party Plaintiff Liberty Mutual Group, Inc. ("LMG") and Third Party Plaintiff Liberty Mutual Insurance Company ("LMIC" and collectively with LMG, "Liberty") respectfully submit this Statement of Undisputed Material Facts in support of their Motion for Summary Judgment, pursuant to Local Rule 56.1.

**Relevant contracts**:

1. LMIC, as "Client," and Third Party Defendant Digitas, Inc. ("Digitas") entered into the Master Services Agreement, dated April 1, 2012 (the "MSA"). Declaration of Anthony A. Froio in support of Liberty's Motion for Summary Judgment filed herewith ("Froio Decl.") ¶ 2, Ex. A.

2. In the MSA, Digitas warranted that "All Services will be performed in a competent and professional manner by qualified personnel and will conform to Client's requirements as specified in the applicable SOW." *Id*. § 9.a.v.

3. In the MSA, Digitas further warranted that it "will provide to Client, to the extent possible, the full benefit of all covenants, warranties, representations and indemnities granted to Digitas by third parties in connection with any Services or Deliverables." *Id*. § 9.a.vii.

4. In the MSA, the term "Services" is defined as "the work to be performed by Digitas which will be described in one or more [] Statement of Work(s) executed by the parties and referencing this Agreement using such form as the parties agree." *Id*. § 1.k.

5. Section 14 of the MSA contains the following provision:

> Each party agrees to indemnify and hold harmless the other party and their respective officers, directors, shareholders, members, managers, partners, employees, accountants, attorneys, agents, affiliates, subsidiaries, and permitted successors and assigns (collectively, the "Indemnitees") from and against any and all third party claims, damages, liabilities, costs and expenses, including reasonable legal fees and expenses (collectively, "Claims"), to the extent arising out of any breach of any warranty, representation, covenant, obligation or agreement made by the indemnifying party in this Agreement, provided that in no event shall a party indemnify another party to the extent of any Claim arising on account of the gross negligence or intentional misconduct of any Indemnitee. The

1

> foregoing indemnity is conditioned upon (i) prompt written notice by the indemnified party to the indemnifying party of any claim, action or demand for which indemnity is claimed; (ii) the opportunity for complete control of the defense and settlement thereof by the indemnifying party; and (iii) such reasonable cooperation, at the indemnifying party's expense, by the indemnified party in the defense as the indemnifying party may request.

*Id*. § 14.a.

6. Digitas and LMIC entered into the "DigitasLBI Statement(s) of Work" (the "SOW") dated February 6, 2015. Froio Decl. ¶ 3, Ex. B. LMIC is identified as "Client" in the SOW. *Id*.

7. The SOW states that "DigitasLBi will partner with Liberty Mutual in developing strategic digital programs to help drive acquisition of new customers and provide services in order to help accomplish Liberty Mutual's 2015 goals." *Id*. § B.

8. The SOW outlines the following "tactics" in connection with "interactive marketing": "paid search, aggregator, affiliate and landing pages (tracking and readout only)." *Id*. Warm transfers were not included. *Id*.

9. Digitas, as "Agency," and Cross-Defendant Spanish Quotes, Inc. d/b/a WeSpeakInsurance ("We Speak"), as "Company," entered into the Aggregator Service Agreement, dated October 31, 2013 (the "ASA"). Froio Decl. ¶ 4, Ex. C.

10. ASA § 7.a contains the following provision: "Company further warrants that Services will meet the specifications in all material respects and will not violate the proprietary rights of any third party, or otherwise violate any other laws, rules or regulations of the United States." *Id*. § 7.a.

11. The ASA defines the term "Services" as "Agency's requirements for the services, including Work Product as defined below." *Id*. § 1.a.

12. The ASA defines the term "Work Product" as "all reports, deliverables, reproductions, derivatives or any elements thereof developed or produced for Agency or, if applicable, on the account of the Client regardless of the form." *Id*. § 9.

13. Section 7.d. of the ASA contains the following provision:

> Company agrees to indemnify, defend and hold harmless Agency, its affiliates, subsidiaries, officers and employees, as well as any Agency Client, Client's affiliates, subsidiaries, officers and employees, from and against any and all claims, damages, liabilities, losses and/or expenses, including reasonable attorney fees, (collectively "Losses") incurred by Agency and/or its Client and arising from a breach of the foregoing warranties, breach of the Privacy and Data Security Terms (if applicable) or any other material breach of this Agreement.

*Id*. § 7.d.

14. The ASA defines the term "Agency" as DigitasLBi. *Id*. at introductory paragraph.

15. The ASA defines the term "Client" as "client(s) referenced in the Scope of Work." *Id*. at second WHEREAS clause.

**<u>Warm transfers</u>**

16. Warm transfers are "when a customer has consented to receive a quote. An outbound dial is made. The customer's intent to speak with someone for a quote at that time is validated, and they are sent on over to our call center to receive the quote." Froio Decl. ¶ 5, Ex. D, at 24:4-9.

17. An outbound dial is when "[a] phone call is placed to the number that the customer indicated on the lead form." *Id*. at 24:10-13.

18. Liberty prohibited warm transfers via the online Invoca platform. In the answer to Plaintiff's Interrogatory No. 17, Liberty stated:

> [D]ocument Bates-stamped LM00031 is a screenshot from the Invoca database that provides additional information and details about the 'Digitas: WeSpeakInsurance' program. Specifically, the screenshot includes a list of promotional methods and identifies whether each listed method is or is not allowed in the program. 'Lead Form' and 'Call Center' promotional methods are not allowed in the Digitas: WeSpeakInsurance program. 'Lead Form' in this context identifies a promotional method where a consumer visits a website and

3

        completes a form. That form requests contact information and consent to be contacted about an insurance quote.

Froio Decl. ¶¶ 6-7, Ex. E, Ex. F at 16.

19. Invoca is a "web-based platform that allows for tracking of inbound calls." It "contains details about inbound calls, such as dates, times, call duration, call origination, telephone numbers, and call programs/campaigns." Froio Decl. ¶ 7, Ex. F at 7 (Interrogatory Response No. 5).

**The calls to Mr. Johansen and the underlying litigation**

20. Plaintiff Ken Johansen sued LMG and We Speak for calls he allegedly received on his residential telephone number, (614) 791-XXXX, in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. ("TCPA"), a federal consumer-protection law. ECF No. 1 at ¶¶ 1, 3, 4, 34, 35, 56, 65, 75.

21. Specifically, Mr. Johansen alleged he received calls on December 23, 2014, February 17, 18, and 20, 2015, and March 16, 2015. *Id.* at ¶¶ 35, 56, 65, 75.

22. Mr. Johansen kept detailed records of the calls he made and received, and he noted that the calls he received on February 17, 18 and 20, 2015 came from "Commission Junction." Froio Decl. ¶ 8, Ex. G at 66:8-21, 73:12-25, 74:11-12, Ex. H, Ex. I at PLFF_000002.

23. On February 17, 2015, Mr. Johansen spoke with Jason Stacy of Auto Insurance Services. Mr. Stacy said, "I'm showing here you requested a free auto insurance quote on your vehicle a while back. Were we able to supply you with a free quote?" Mr. Johansen responded, "[a]h, no, I don't think you did." Mr. Johansen was then transferred to Jeanie Aeilts of Liberty Mutual Insurance. Froio Decl. ¶ 8, Ex. G at 130:11 – 131:15, Ex. J.

24. In his records, Mr. Johansen noted that on February 17, 2015, he received a call at (614) 791-XXXX, spoke with "Jason Stacey of Auto Insurance Quote Services," confirmed interest in

4

an auto insurance quote, and was "transferred . . . to a Liberty Mutual Insurance Agent." Froio Decl. ¶ 8, Ex. G at 66:8-21, Ex. H.

25. On February 18, 2015, Mr. Johansen spoke with David from Auto Insurance Services. David said, "I show here that you requested insurance information on your current vehicle a while back. Were we able to supply you with this quote?" Mr. Johansen responded, "[n]o, I don't think so." Mr. Johansen was then transferred to Mingo Rubio of Liberty Mutual. Froio Decl. ¶ 8, Ex. G at 137:16 – 140:2, Ex. K.

26. In his records, Mr. Johansen noted that on February 18, 2015, he received a call at (614) 791-XXXX, spoke with "David of Auto Insurance Services," confirmed interest in an auto insurance quote, and was "transferred . . . to a Liberty Mutual Insurance Agent." Froio Decl. ¶ 8, Ex. G at 66:8-21, Ex. H.

27. In a second call on February 18, 2015, Mr. Johansen spoke with Jason Stacy of Auto Insurance Services. Mr. Stacy said, "I'm showing here you requested a free auto insurance quote on your vehicle a while back. Were we able to supply you with that quote?" Mr. Johansen responded, "[a]h, no." Mr. Johansen was then transferred to Carl McCalister of Liberty Mutual Insurance. Froio Decl. ¶ 8, Ex. G at 147:10-20, 151:8-24, Ex. L.

28. In his records, Mr. Johansen noted that also on February 18, 2015, he received a call at (614) 791-XXXX, also spoke with "Jason of Auto Insurance Services," confirmed interest in an auto insurance quote, and was "transferred . . . to a Liberty Mutual Insurance Agent." Froio Decl. ¶ 8, Ex. G at 66:8-21, Ex. H.

29. On February 20, 2015, Mr. Johansen spoke with Jason of Auto Insurance Services. Jason said, "I'm showing here that you requested a free quote on your vehicle a while back. Were we, were we able to provide you with a free auto insurance quote?" Mr. Johansen responded,

5

"[h]mmm, no." Mr. Johansen was then transferred to Kemo Hernandez of Liberty Mutual Insurance. Froio Decl. ¶ 8, Ex. G at 154:5-20, 155:10-16, Ex. M.

30. In his records, Mr. Johansen noted that on February 20, 2015, he received a call at (614) 791-XXXX, spoke with "Jason of Auto Insurance Services," confirmed interest in an auto insurance quote, and was "transferred . . . to a Liberty Mutual Insurance Agent." Froio Decl. ¶ 8, Ex. G at 66:8-21, Ex. H.

31. On March 16, 2015, Mr. Johansen spoke with Jared from Insurance Care Center. Jared said, "[y]ou recently submitted a quote request with us or one of our affiliates." Mr. Johansen responded, "[u]m, hum." Mr. Johansen was then transferred to Jose Martinez of Liberty Mutual Insurance. Froio Decl. ¶ 8, Ex. G at 159:20 – 160:4, 161:21 – 162:1, 162:17-19, 165:20-23, Ex. N.

32. In his records, Mr. Johansen noted that on March 16, 2015, he received a call at (614) 791-XXXX, spoke with "Jerred of Insurance Care Center," confirmed interest in an auto insurance quote, and was "transferred . . . to a Liberty Mutual agent." Froio Decl. ¶ 8, Ex. G at 66:8-21, Ex. H.

33. An automobile insurance quote request for an individual identified as "Rita Johansen" was submitted on June 13, 2014, through a website with the URL "autoquotesdirect.com." Froio Decl. ¶ 9, Ex. O at ¶ 2.

34. This website included the following language: "I agree to receive calls about insurance products (which may be auto-dialed, use artificial or pre-recorded voices, and/or be text messages) from these companies and their agents to the number I've provided." *Id*. ¶ 4.

35. "On June 13, 2014, the text 'these companies' contained a hyperlink through which a consumer would have been able to access the list of companies by whom they consented to be

contacted." *Id*. Among numerous companies named in the hyperlink, "Liberty Mutual Insurance Company" was listed. *Id*. ¶¶ 4-5.

36. The telephone number provided for the individual identified as "Rita Johansen" was (614) 791-XXXX, the same number to which the calls to Mr. Johansen were placed. *Id*. ¶¶ 7, 8.a; *see also supra* ¶ 20.

37. The car for which interest in auto insurance was requested by the individual identified as "Rita Johansen" was a 2003 Honda Accord. *Id*. ¶ 8.b.

**Digitas' investigation of calls to Mr. Johansen**

38. On March 9, 2015, Bailey Kunz (from email address bkunz@cj.com) emailed Laura Spinello about "a notice from a customer complaining they received unsolicited calls from Liberty Mutual, and that Liberty Mutual said the lead came from CJ." Froio Decl. ¶ 10, Ex. P at DTAS000053.

39. After Robert Maccioli of Digitas was brought into the discussion, he asked for information regarding the customer in order to trace the calls complained of and was provided with Mr. Johansen's name and telephone number of (614) 791-XXXX. *Id*. DTAS000052.

40. On March 9, 2015, Mr. Maccioli confirmed: "none of the campaigns that we work with Andrew [Palermo of Liberty] on for Agg/Aff should have calling out as a feature; if there are any outbound calls happening that then lead to transfers, we jump on them as soon as we hear about them." Froio Decl. ¶ 11, Ex. Q at LM00088; *see also* Froio Decl. ¶ 10, Ex. P at DTAS000046 (Mr. Maccioli communicates with Mr. Palermo of Liberty).

41. At approximately the same time, Mr. Maccioli emailed his internal team at Digitas, Christopher Li and Caitlyn Colombi, regarding the same complaint raised by CJ. Froio Decl. ¶

12, Ex. R at DTAS000064 - -65. He subsequently provided his team with the consumer's telephone number (614) 791-XXXX. *Id.* DTAS000064.

42. Mr. Maccioli then asked Ms. Colombi to look for specific information for the call associated with the telephone number (614) 791-XXXX, in particular the "specific source within the campaign (on our end, a source is denoted by looking at the end of the promo # (the 800#) and looking for an[] 's' and then a number – e.g., s37)." *Id.* DTAS000063.

43. That same day on March 9, 2015, Mr. Li of Digitas contacted We Speak President Jaime Pickles and employee Dave Stafford, about certain calls: "your largest English Auto source (s63) had at least 9 warm transfers (callers saying 'you called me') . . . .The source has cut out for the weekend, but we need to figure out where this traffic is coming from and ensure that this is taken care of." Froio Decl. ¶ 13, Ex. S at DTAS000032.

44. On March 9, 2015, Mr. Pickles responded to Mr. Li (copying Mr. Maccioli) and said: "As with all our sources, they are strictly prohibited from doing transfers, so any transfers they made as part of the calls we received from them will be excluded from LMs invoice." *Id.* DTAS000031.

45. On March 9, 2015, Mr. Maccioli responded to Mr. Pickles about "another transfers situation that has just came to light," which transfer Mr. Maccioli specified was only "one of many we have spotted from this source." *Id.* DTAS000031. Mr. Pickles sought more information, to which Mr. Maccioli responded as follows:

> A consumer (from February) grilled a Liberty Mutual call center rep about the origin of his call and was able to piece together some information, after getting called multiple times by the same publisher (the one that is associated with the caller ID we provided in this instance).

*Id.* DTAS000030.

46. On March 9, 2015, Mr. Maccioli reported back to CJ:

35837715.1

This consumer has been contacted through outbound dialing (against his wish) and he asked our call center rep for any info that he/she could give him regarding how he was transferred into the LM call center (which is also against our policy for the program this 800# is being used for); at that point, the only info that the call center rep had was the incorrectly mapped (or old mapping) which showed it being 'Comm Junction.'"

Froio Decl. ¶ 10, Ex. P at DTAS000051.

47. On March 12, 2015, Mr. Pickles responded to the transfer raised by Mr. Maccioli:

We were told that all of their calls were from search click-to-call. When we received Bob's email, we suspended their number immediately. We have terminated the agreement given their response which was very cloudy. Somewhat similar to issue 1 above, they told us that someone on their team saw that our campaign was doing well in terms of the revenue/call, so they inserted our number into their warm transfer program as well. They did not tell us the breakdown of number of calls coming from search and warm transfers – only saying the majority were from search. In Feb, LM received 194 paid calls from this source. March was 43 paid calls. Since we don't know the breakdown of the calls from search and warm transfers, we will not charge LM for the 237 paid calls.

Froio Decl. ¶ 13, Ex. S at DTAS000029.

48. On March 24, 2015, Mr. Maccioli followed up with Mr. Pickles and Mr. Stafford "regarding a couple of transfers." Mr. Maccioli reported:

[W]e had a request come in around the consumer that previously reported transfers, so we did a check for his caller ID and spotted it again on 3/16. It is showing up under a different source number on our side . . . We also just quickly sampled a few other calls that showed as being potential transfers and found another one that was also from what we see as the same source ID on our side. The two calls for your reference to trace are:

| Date | SID (on LM side) | Caller ID |
|---|---|---|
| 19-Mar | s63 | 623-329-XXXX |
| 16-Mar | s63 | 614-791-XXXX |

We need to quickly determine who is behind these calls, especially for the 614# and get them shut off.

*Id.* DTAS000028.

49. Mr. Maccioli provided more information to Mr. Pickles and Mr. Stafford regarding the "614#" consumer:

> For the 614#, this consumer was contacted multiple times last month with outbound calls that were found to be from InsuranceCalls.com. From everything we could hear, he did not initiate the calls and we could specifically hear the transfer occur in some instances. For this call on 3/16, the consumer states, "I just talked to a telemarketer who said you could provide me with an insurance quote" and we can distinctly hear a sound that we have been able to associate with transfers (an audible noise that sounds like a "bubble") as we assume the transfer rep is dropping off the line.

*Id*. DTAS000027.

50. Also on March 24, 2015, Mr. Maccioli connected representatives of We Speak and Invoca regarding a "report of warm transfers." Froio Decl. ¶ 14, Ex. T at DTAS000057. Mr. Maccioli provided the following information:

| Date   | SID (on LM side) | Caller ID    |
|--------|------------------|--------------|
| 19-Mar | s63              | 623-329-XXXX |
| 16-Mar | s63              | 614-791-XXXX |

> As noted, the 614# above is a consumer that previously received a number of calls in mid-February that were also directed through this campaign. At that point, it was determined that the SID (as seen by LM and DTAS) was S6 and that the exact publisher was InsuranceCalls.com. The publisher was deactivated from the campaign. At this point, as you can see above, the SID (as seen by LM and DTAS) is S63 and we are yet to determine who the exact publisher is; our fear is that somehow InsuranceCalls.com has made it back into the program as a subsource – based on the same exact consumer being contacted.

*Id*. DTAS000057 – DTAS000058.

51. On March 31, 2015, Mr. Maccioli confirmed with CJ – the party who initially brought Mr. Johansen's complaint to Digitas' attention: "We have taken measures on our end that we believe should resolve the issue of him being transferred into our call center, with the key word being 'transferred.' We do not allow 'transfers' in our call programs, so when he has made his

10

35837715.1

way into our call center, it has been against program rules." Froio Decl. ¶ 10, Ex. P at DTAS000048.

**Data from call records regarding Mr. Johansen's calls**

52. Calls records produced by Liberty identify Digitas as the "advertiser" and "publisher," and We Speak as the "advertiser campaign" for the calls on February 17, 18 (two calls), and 20, 2015, and March 16, 2015, all on telephone number (614) 791-XXXX. Froio Decl. ¶ 15, Ex. U.

53. The sources denoted in Liberty's call records were "888-790-1065 s6" for the February calls and "888-790-1065 s63" for the March call. *Id.*

54. Call records produced by call-tracking vendor Invoca identify Digitas and We Speak as the advertisers for the calls to Mr. Johansen on his residential telephone number (614) 791-XXXX. Froio Decl. ¶ 16, Ex. V.

**Liberty's damages**

55. For litigation that commenced nearly four years ago, which included extensive investigation and discovery, motion practice, interactions with numerous parties and third parties, and working with an expert on class certification issues, as of February 4, 2019, Liberty has incurred in excess of $1.4 million in legal fees and costs in the defense of the underlying litigation initiated by Mr. Johansen, the Cross-Claim and the Third Party Complaint. Froio Decl. ¶ 17.

56. Liberty paid a portion of the settlement payment to Mr. Johansen to resolve the underlying litigation, which Digitas and We Speak refused to pay in its entirety. Froio Decl. ¶ 18.

**Liberty's efforts to be indemnified by Digitas**

57. On August 7, 2015, Liberty notified Digitas of the litigation initiated by Mr. Johansen and enclosed a copy of the Complaint. Froio Decl. ¶ 19, Ex. W.

58. The undersigned counsel recited to counsel for Digitas the following statement made to him by counsel for Digitas: "Digitas would likely avail itself of the opportunity to take full control of the defense of the litigation." Froio Decl. ¶ 20, Ex. X. Digitas never assumed complete control of the defense and settlement of the case. Froio Decl. ¶ 20.

59. Digitas attempted to argue that the condition regarding opportunity for complete control of the case actually required Liberty to have "tendered" the defense. ECF No. 69 at 10-11. This Court, however, confirmed that "the MSA does not actually require that the request for defense be 'tendered.'" ECF No. 123 at 19.

60. Digitas also attempted to argue that its indemnity obligation was not yet ripe. ECF No. 69 at 11. This Court confirmed that the indemnity obligation was ripe. ECF No. 123 at 21.

61. Digitas moved to dismiss the Third Party Complaint on April 20, 2016 (ECF No. 68), appealed this Court's denial of that motion on December 16, 2016 (ECF No. 124), participated in a Joint Motion to disqualify Plaintiff as class representative on May 8, 2017 (ECF No. 136), and moved for a protective order on June 29, 2017 (ECF No. 155) against a Fed. R. Civ. P. 30(b)(6) Notice of Deposition served by Mr. Johansen. Digitas also appeared in depositions of Mr. Johansen on May 26, 2016, and Liberty's designated Fed. R. Civ. P. 30(b)(6) witness Ryan Hemker on May 10, 2016. Froio Decl. Ex. D at 4, Ex. G at 4.

DATED: February 28, 2019

Respectfully submitted,

LIBERTY MUTUAL GROUP, INC. and
LIBERTY MUTUAL INSURANCE COMPANY
By its attorneys,

*/s/ Manleen Singh*_____
Anthony A. Froio (BBO: 554708)
Manleen Singh (BBO: 686686)
ROBINS KAPLAN LLP
800 Boylston Street, 25th Floor
Boston, MA 02199
(617) 267-2300
afroio@robinskaplan.com
msingh@robinskaplan.com

Michael D. Reif (*admitted pro hac vice*)
ROBINS KAPLAN LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
(612) 349-8500
mreif@robinskaplan.com

## CERTIFICATE OF SERVICE

I, Manleen Singh, hereby certify that the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on February 28, 2019.

*/s/ Manleen Singh*_____
Manleen Singh